(Decided 1st May, 1880.)

---

WILLIAM A. STEWART and EDWARD DUFFY, Trustees *vs.* THE FIREMEN'S INSURANCE COMPANY OF BALTIMORE, and others.

*Right of Trustees appointed by a Court of Equity to maintain a bill for Breaches of Trust committed by former testamentary Trustees—Liability of a Corporation which permitted Transfers of Stocks by Trustees, not Ordered by Court, nor Sanctioned by the Will under which they held their office.*

In 1864, J. J., being the owner of 1069 shares of stock in the F. I. Co., died, leaving a will, by which after some small bequests, he directed all the residue of his property to be equally divided, and gave one-half thereof to trustees, in trust for his grandson, J. J. T. for life, with contingent remainders over, and the other half to the same trustees, in trust for another grandson, J. J. J. for life, with contingent remainders over. W. S. and J. J. T. were appointed executors and trustees, entered upon the discharge of their duties, and passed their first and final account in the Orphans' Court on the 30th June, 1866, by which they retained as trustees for J. J. T., to be held subject to the trust purposes mentioned in the will, 534½ shares of said stock and a like number of shares, subject to the same trust purposes, for J. J. J. J. J. J. did not attain majority till 1875. In 1869, upon application of the infant's next friend, the Circuit

Stewart and Duffy, Trustees *vs.* Firem. Ins. Co., *et al.*

·Court of Baltimore City assumed jurisdiction over the trusts, and required bond of the trustees, which they gave. In 1870, '71 and '72, W and J. J. T. with the permission of the F. I. Co., but without order of Court and without the sanction of the will of J. J., transferred portions of the stock amounting to 532 shares in all, and appropriated the proceeds to their own use. Upon the petition of the infant by his next friend, they were removed from the trust in 1874, and the appellants appointed in their stead. The Court in 1875 directed the new trustees to proceed to recover the stock thus lost to the trust estate or its value; upon which the appellants filed a bill for that purpose, against the F. I. Co., the former trustees having become insolvent. HELD:

1st. That the Court of equity had jurisdiction, and that the bill filed by the trustees against the appellee was maintainable.

2nd. That there was such negligence on the part of the appellee's officers, (it being chargeable with knowledge,) in allowing the transfers of the stock to be made, as rendered the appellee responsible to the appellants for the resulting loss.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., GRASON, MILLER, ALVEY, ROBINSON and IRVING, J.

*Edward Duffy* and *William A. Stewart,* for the appellants.

*George Hawkins Williams* and *S. T. Wallis,* for the appellee.

MILLER, J., delivered the opinion of the Court.

Joseph Johnson died in March, 1864, leaving a will by which, after some small bequests, he directed all the residue of his property to be divided into two equal parts, and then devised one part to trustees, in trust for his grandson, Joseph J. Tyson, *for life,* with remainder to his chil-

dren and their descendants, if he left any living at the time of his death, and if not then over, and the other part to the same trustees in trust for his grandson, Joseph J. Johnson, *for life,* with like remainder to his children and their descendants, and with like contingent limitation over. The greater part of the testator's personal estate consisted of 1069 shares of stock in the Firemen's Insurance Company, worth at the time of his death more than $60,000. The trustees to whom the property was thus devised were William Simms and the grandson, Joseph J. Tyson, who were also appointed by the testator his executors. They accepted these trusts, and in June, 1866, presented to the Orphans' Court their first and final account as executors, in which, after payment of debts and legacies, they crave an allowance for 534½ shares of this stock, *retained* by them as trustees for Joseph J. Tyson, to be held subject to the trust purposes mentioned in the will, and for a like number of shares retained by them as trustees for Joseph J. Johnson, to be held subject to the same trust purposes. This account was duly sworn to by the executors and *passed* by order of the Court on the 30th of June, 1866.

When the testator died, his grandson, Joseph J. Johnson was an infant and did not attain majority until October, 1875. In the meantime, proceedings in behalf of the infant were instituted in the Circuit Court of Baltimore City, under which that Court, as a Court of equity, assumed jurisdiction and control over the administration of the trusts, and in April, 1869, passed an order requiring the trustees to give bond for the faithful performance of their duties, which they did. Afterwards, in 1870, 1871 and 1872, the trustees, with the consent or permission of the Insurance Company, transferred portions of this stock, amounting to 532 shares in all, and appropriated the proceeds to their own use. In October, 1874, but before discovery of these transfers, the trustees, upon petition of the

infant, were removed from the trust, and the appellants, Duffy and Stewart, appointed trustees in their place. The decree which effected this removal and appointment, was passed in the proceedings referred to, and clothed the new trustees "with all the power and authority conferred upon or vested in" the removed trustees, "in and by virtue of the last will of Joseph Johnson, deceased, but subject to the future order of this Court in relation to said trust," and directed the old trustees to deliver up to the new ones "the money, bank-books and securities in their hands belonging to the trust estate." After this, in October, 1875, the new trustees filed a petition in the cause in which they charged that the former trustees had failed to deliver to them 532 shares of the stock in question, and prayed they might be required to do so. In their answer to this petition, the old trustees admitted they had sold these shares and had used the proceeds in their business, and were now unable to return the same, being insolvent. The Court thereupon passed an order directing the new trustees "to proceed to recover the moneys and securities belonging to said trust, admitted by said Simms and Tyson to have been disposed of without the sanction of this Court; and said trustees are hereby authorized to proceed at once against the sureties in the bond filed by said Simms and Tyson in these proceedings, and also take such other measures as may in their judgment be necessary to obtain possession of said moneys and securities, or damages for the conversion of the same."

The new trustees then, in March, 1876, filed the bill in the present case against the Insurance Company to recover the stock thus lost to the trust estate or its value. The bill charges that Simms and Tyson had transferred on the books of the company 532 shares of its stock, part of the 1069 standing in the name of Joseph Johnson, deceased, without the order of the equity Court, without the sanction or authority of the will under which they

had been appointed trustees, and in fraud of the rights of the *cestuis que trust* mentioned in the will; that at or before the time the first of these transfers was made, the company well knew and understood that such transfers were without lawful authority, and it is therefore in construction of law a party to the fraudulent acts of the trustees, and is liable to the complainants for the consequences thereof. It also charges the insolvency of the former trustees.

The company in their answer admit the fact of the several transfers of the 532 shares but aver by way of defence: 1st. That after the arrival of the proper time for distribution of the testator's estate, Simms as executor by the authority and with the assent of his co-executor, Tyson, distributed 417 of these shares to said Tyson as distributee thereof under the will, and that Simms and Tyson conjointly, after they had taken to themselves the stock as trustees for some reason unknown to defendants, but supposed by them to be proper and legitimate, transferred, 115 other shares to one Marean. 2nd. They deny that these transfers were illegally or fraudulently made so far as the defendants are concerned, or with any knowledge on their part that the same were in any way improper or unauthorized: they deny that they had any copy of the will or any knowledge of its contents, and aver that the transfers were permitted to be made by them in perfect good faith, fully confiding in the propriety and legality of the same and without notice of any sort to the contrary. 3rd. That even if Simms and Tyson did commit the frauds alleged, the complainants are in duty bound to exhaust their remedies upon the bond which these parties gave as trustees prior to any resort against the defendants, if any they have against them, which they do not admit. 4th. That the only parties damnified by these pretended breaches of trust are the legatees of the stock in remainder, who being designated as a class to take after the death of the respective tenants for life, cannot therefore be ascer-

tained as individually entitled to take until the death of the life tenants, and that these when so ascertained will be the only proper parties to institute proceedings on account of said alleged breaches of trust, and they specially deny the right of the complainants to institute this suit, and also that the Court has any jurisdiction to confer such right if it hath assumed to do so as is alleged.

Afterwards by agreement Simms and Tyson, as executors and trustees were made defendants to the bill, and filed an answer in which they admit they made the transfers, but deny they did so with any fraudulent intent.

Testimony was then taken, but before the case was ready for hearing, Tyson died without leaving children or descendants, so that by the terms of the will the equitable interest in the whole 1069 shares of stock devolved upon the grandson, Joseph J. Johnson for life, with remainder to his children and their descendants if he should leave any, and if not, then over. Upon the hearing the Court below passed a decree dismissing the bill, and from that decree this appeal is taken.

If the bill was filed under proper authority and with proper parties to it, and if the proof makes a case rendering the company liable, it seems to be well settled that a Court of equity has jurisdiction to enforce the liability. We need not review the many decisions cited in argument in support of this position. It is sufficient to say that the leading authorities upon the subject, both in this country and in England sustain the jurisdiction of Courts of equity in such cases. In *Perry on Trust, sec.* 242, the learned author in treating of trusts by equitable construction, states as the result of the authorities in the United States that if a corporation that requires a transfer of its stock to be made by its own officers upon its own books, permits a transfer to be made by an executor, trustee or guardian, of stock held by such persons in a fiduciary capacity, such corporation knowing the trust, and that the transfer is

made for purposes other than such trust, will be held in equity as constructive trustee of the stock thus wrongfully conveyed, and will be liable to make it good to the *cestui que trust;* and for this the cases in Maryland to which we shall have occasion to refer, are cited, in all of which jurisdiction in equity was either conceded or asserted without question. Nor do we think the complainants, if otherwise entitled to maintain the bill, were bound to exhaust their remedy upon the bond of the former trustees before proceeding against the delinquent company. On the contrary, we are of opinion it was not only their right, but their duty, if in their judgment they deemed a suit upon that bond would be ineffectual or insufficient to secure the trust estate, to proceed at once against the responsible corporation.

But it has been argued that the complainants are seeking to make the Company responsible for breaches of trust committed by their predecessors, before they themselves had any legal existence or relation to the trust, and for which of course neither they nor their sureties are responsible, and that for this they have no legal competency merely as trustees, nor by virtue of the order of Court on which they rely; that the parties injured are the legatees in remainder under the will, who alone are competent to sue, and for whom the Court had no authority in the previous case to substitute the trustees now suing; that the position of the complainants is precisely analogous to that of administrators *de bonis non,* who accept by virtue of the statute, and within the limits which it prescribes, have no power to sue for the delinquencies or *devastavits* of their predecessors, nor has any Court, unless under special statute, the power to authorize them to sue for any violation of trust committed before their appointment, and that this is not because of their being administrators merely, but because of a rule and principle common to all classes of trusts alike, viz., that the injury done by the delinquent

fiduciary gives a cause of action to the *cestuis que trust* alone who must seek their own remedies, and cannot give any cause of action to subsequent trustees, who were not legally in existence when the wrong was done, were not injured as trustees by its being done, and were appointed in the stead of the delinquents to administer what they left, and not hold them to account for what they had parted with.

It is true an administrator *de bonis non* cannot in this State maintain an action for a *devastavit* committed by a deceased or displaced administrator, but this doctrine is, we think, founded in reasons not applicable to the present case. Our laws, like those of most of the States, in relation to such administrators, are founded upon the law of England as it was administered in the Ecclesiastical Courts. By these laws the administrator who is displaced, or the representative of a deceased administrator °or executor intestate, are required to account directly to the persons beneficially interested in the estate as distributees, legatees or creditors, and this accounting may be made or enforced in the Probate Court. The remedy for parties thus interested for any waste or misapplication of the effects of the deceased by his administrator or executor, is by an action at law on his administration bond. To the administrator *de bonis non* is committed only, the administration of the goods, chattels and credits of the deceased which remain *in specie,* and have not been "already administered." Our statute limits his authority to the administration of such assets as have not been "converted into money, and not distributed and delivered or retained by the executor or former administrator, under the direction of the Orphans' Court." In view of this law, and the source from which it was borrowed, money received by the administrator and mingled with his own, or other assets sold, wasted or misapplied or converted to his own use, are regarded, so far as the rights and power of the administrator *de bonis non*

are concerned, as already *administered*, and hence he acquires no title to such assets, has no authority to bring an action against any one for their recovery, and cannot therefore sue for a *devastavit* committed by his predecessor in office. *Hagthorp vs. Hook*, 1 *G. & J.*, 270; *Potts vs. Smith*, 23 *Rawle*, 361; *Wernick vs. McMurdo*, 5 *Rand*, 51; *Cassick vs. Cassick*, 23 *N. J. Eq.*, 364; *Beall vs. New Mexico*, 16 *Wallace*, 535. But there is no such statutory limitation upon the power of trustees appointed to succeed others in the administration of a conventional trust, and we see no good reason why any such restriction should be imposed by the Courts. In case of a trust like the one before us we cannot doubt the power of a Court of equity, at the instance of the *cestuis que trust* to supervise the trustees in its management, to remove them for misconduct and appoint others in their place, clothed with all the power and authority over the trust estate which the original trustees had under the instrument creating the trust. Why, then, is it not competent for the complainants to maintain this bill to recover the portion of the trust property which they aver has been lost through the misconduct of their predecessors and the negligence of the defendant corporation? It is true the question has never been expressly decided in this State, but in *Thruston vs. Blackiston*, 36 *Md.*, 501, a similar bill was sustained without any such objection being interposed. In the case of *Loring vs. Salisbury Mills*, 125 *Mass.*, 138, a trustee under a marriage settlement invested a portion of the trust funds in the stock of a manufacturing corporation, and afterwards committed a breach of trust by transferring the certificates for the stock to various persons by transfers absolute in form, but in fact as collateral security for his own debts. The certificates thus assigned were surrendered to the corporation and new ones were issued by it to the assignees. The trustee then died, and under a power contained in the instrument another trustee was ap-

pointed in his place, who thereupon brought an action at law against the corporation. . The Court held that this suit could not be maintained, but allowed the plaintiff to amend by changing the action at law into a suit in equity, saying: "By virtue of the terms of the original indenture and the power of appointment executed in accordance therewith the plaintiff has clearly become in equity, the assignee of any rights of action for injuries to the trust property before his appointment." The bill was then filed and the corporation was held liable upon the ground that it had notice that the original holder of the stock was a trustee, and of the name of his *cestui que trust*, and had issued the new certificates without making any inquiry whether his trust authorized him to make a transfer. In disposing of the case upon the merits the Court again say: "The new trustee appointed in the place of Rogers not being able, as we have already held, for technical reasons, to maintain an action at law against the corporation, he is clearly entitled to maintain this bill in equity." But apart from authority, and assuming the question is one of first impression we have no difficulty in sustaining the right of trustees appointed, as in the present case, to maintain suits against the proper parties for breaches of trust committed by, or injuries done to the trust property while in the hands and under the management of their predecessors. The most common class of trusts are those in favor of infants or children not *in esse* when the trusts are created, and if it should be held that the defrauded *cestuis que trust* are alone competent to sue for such injuries, a large majority of trust estates will be exposed to the danger of irreparable loss or entire destruction, and Courts of equity will be unable to exercise with effect one of the most beneficial and important powers relating to a subject peculiarly within the scope of their exclusive jurisdiction.

But it is further argued that even if the present trustees are entitled to sue, still the bill is defective, because the

*cestuis que trust* are not made parties. The general rule undoubtedly is that in suits respecting trust property, either by or against the trustees, the *cestuis que trust* as well as the trustees are necessary parties. But where the suit is brought by the trustees simply to recover the trust property, and in nowise affects his relation with his *cestuis que trust,* it is unnecessary to make the latter parties. *Casey, et al. vs. Brown,* 2 *Otto,* 171; *Ashton vs. Atlantic Bank,* 3 *Allen,* 217. Such we think is the character of this bill. The trustees have no adverse claim against the *cestuis que trust,* and the objects of the bill is simply to secure their interests. It merely seeks to recover trust funds so as to enable the trustees to hold and administer them agreeably to the trusts declared in the will, and under the supervision of the Court in the case already instituted to which the *cestuis que trust* are or can be made parties.

  The remaining inquiry is, have the complainants made out a case entitling them to relief against the defendant corporation? The stock in question stood on the books of the company in the name of Joseph Johnson, the original owner from the time of his death until the alleged unauthorized transfers thereof, and in this respect the case differs from that of *Albert and Wife vs. Savings Bank,* 2 *Md.,* 159. In that case the stock never belonged to the testator and never stood in his name, but was purchased by his executors after his death. Other facts established by the testimony are as follows: On the 18th of November, 1870, Simms and Tyson, as *executors,* transferred 115 shares of this stock standing in the name of Joseph Johnson to Joseph Johnson. Why stock thus standing in the name of the testator should be transferred by his executors to the testator himself does not appear. It was certainly a very unusual and extraordinary transaction, for on the same day the same parties as executors transferred the same shares to Charles Marean, who appears to have held them until the 23rd of March, 1871, when he transferred

them to Tyson in his individual right. On the 1st of May, 1871, Simms alone, *as executor*, transferred 108 other shares to Tyson in his individual name. At this time, therefore, Tyson became the ostensible owner in his own absolute right of 223 shares of this stock, and on the 23rd of February, 1872, he transferred all of them to the Franklin Bank. Afterwards, on the 14th of March, 1872, Simms in like manner transferred 110 shares to Tyson, and on the *next day* Tyson transferred them to the National Bank of Baltimore. Again, on the 16th of May, 1872, Simms transferred in the same manner 112 shares to Tyson, and *eight days* thereafter Tyson transferred them to the Merchants' National Bank. Finally, on the 27th of December, 1872, Simms in the same way transferred 87 shares to Tyson, and these were subsequently, in July and October, 1873, transferred by Tyson to Henry Frank. In this mode the whole 532 shares were disposed of. All these transfers, including the two first signed by Simms and Tyson as *executors*, and the others by Simms alone as *executor*, were entered upon the stock ledger of the company, and as each were made the old certificates in the name of the testator were delivered to the company, and they issued new ones to Tyson in his individual right. During the period covered by these transfers, as well as prior thereto, Simms was one of the directors of the company. The proof further shows that during the same period Simms and Tyson were partners carrying on a grocery business in Baltimore, and the stock which Tyson thus acquired was transferred to the banks and to Frank as collateral security for money loaned to this firm thereon, and these transferees afterwards sold it on failure of the pledgors to redeem.

The fact that Simms and Tyson in making these transfers professed to act as *executors* of Johnson, the deceased stockholder, gave the company, or its officers to whom superintendence of transfers of its stock was committed,

actual notice that Johnson left a will which was open to
inspection upon the public records, and made the company
chargeable to the same extent as if such officers had actu-
ally read it, and thereby made themselves acquainted with
its contents.   The company therefore must be dealt with
in this case as if it had actual knowledge of the provisions
of that will at the time the first transfer was proposed to
be made.   This proposition was expressly decided by Chief
Justice TANEY, in the case of *Lowry vs. Commercial and
Farmers' Bank, Campbell's Rep.*, 310.   That case has be-
come a leading authority in this country, and the princi-
ples it announces have been adopted and approved by this
Court in *Albert and Wife vs. Savings Bank*, (2 *Md.*, 16ᵡ,) as
"founded in sound policy." An inspection of Johnson's
will would have disclosed the fact, beyond mistake by any
one capable of reading it, that it gave these parties no
authority either in their capacity as executors or as trus-
tees, to transfer, or in anywise dispose of, any portion
of this stock.   The only power of disposal which the
will in terms vest in them, is to lease perpetually or
otherwise, and upon such terms as they may deem
proper any or all of the testator's "landed estate." Un-
doubtedly this stock was liable to be sold if necessary, for
the payment of the debts of the testator and the execu-
tors in the regular execution of their duties would have
had power to sell it for that purpose.   But when the first
of these transfers was made the testator had been dead
more than six years, and the time had long before elapsed
within which the law required the debts to be paid, and
the estate settled up by the executors.   The company is
chargeable with knowledge of these facts.   But more than
this, the character of the transfers themselves was sufficient
to give the company notice that payment of debts was
not the purpose designed, or was at least sufficient to
put the officers of the company upon inquiry as to that
matter.   A transfer of stock by one executor to another

in his individual name is an unusual proceeding, and is not the mode which joint executors would naturally adopt, if their purpose was to sell the stock or raise money upon it to pay the debts of their testator.

The slightest inquiry in the Orphans' Court where the will was recorded, and where the law required the personal estate to be administered by the executors, would have disclosed the fact that the debts had long before been paid and the estate settled up. Besides, in *Lowry's case* where the bank was held liable, there was a similar state of facts as to the length of time after the death of the testator before the transfer was made, and like facility for ascertaining the true state of the case on inquiry. Nor can the company, thus charged with knowledge of the contents of the will, be excused on the ground that they had the right to suppose the transfers were being made in due course of *distribution*. Under the will Tyson was not a distributee, nor a legatee for life and entitled as such to have the stock transferred to him in his individual name. He was merely a *cestui que trust* for life, and the dividends upon one-half of the stock during life was the only beneficial interest in it which the will gave him. Conjointly with Simms he was made a *trustee* to hold the legal title, and in no other capacity was he entitled to hold the stock for a single day after his duties as executor had been discharged. This appears so plainly on the face of the will, that no one reading it could have mistaken its meaning in this respect.

But it is said that when these transfers were made the stock had by operation of law been transferred from the *executors* to the same parties as *trustees*, and that they are to be regarded as having then held it in the latter capacity. Conceding this to be so, we do not see how it can avail the company as a defence in this suit. It may be true that an innocent assignee for value under an assignment executed by these parties as *executors*, would have taken

37          v. 53.

the same title as if the assignment had been executed by them as *trustees,* but the company in this case stands in no such position. It was not an assignee of the stock, but the custodian of it, clothed with sufficient power and charged with the duty of protecting it from unauthorized transfers ; and the complaint is that its officers were negligent in the discharge of that duty, whereby loss has resulted to the rightful owner. The question here is what knowledge had the company at the time, or what knowledge was imputable to it from the forms of the transfers themselves and the character in which the parties making them professed to act, and not what title such parties could have conveyed to a stranger. We have said that when the parties making the transfers proposed to do so, and professed to act as *executors,* that fact, of itself, gave the company notice of the will and made it chargeable to the same extent as if it had actually read it; and in our judgment this imputation of knowledge, is not affected by the fact that the parties thus declaring themselves to the company, and holding themselves out, and professing to act as *executors,* might at the time, by operation of law, have held title to the stock as trustees. No actual transfer on the books of the company by the executors to themselves as trustees had ever been made. Having then this notice of the will, the company had notice of the trusts it contained, including the names of the trustees, of the *cestuis que trust* for life, and of the provisions in favor of children thereafter to be born. The case then falls directly within the principles laid down in *Loring vs. Salisbury Mills,* in *Farmers and Mechanics' Bank vs. Wayman and Stockett,* 5 *Gill,* 336, and the whole line of authorities on this subject. In whatever light, therefore, the case may be viewed we are convinced there was such negligence on the part of its officers in allowing these transfers to be made as to render the company responsible to the complainants for the resulting loss.

It will be observed that in thus disposing of the case no reference is made to the Act of 1843, ch. 304, now con-stituting sec. 274, Art. 93 of the Code. By this omission we are not to be understood as intimating that a *transfer* by the administrator or executor, of stock in a bank or other corporation like the present defendant, belonging to and standing in the name of a deceased stockholder, is not a *sale* of the property of the decedent within the purview of that Act. We regard the liability of the company in this case as made out independently of the provisions of that statute, and for that reason have made no reference to it in determining that liability.

The company is not responsible for the dividends on the stock that accrued after the transfers and before the death of Tyson. These belonged to Tyson himself and the trust estate has no claim to them. The complainants are entitled to a decree compelling the company to replace the 532 shares on its books in their names as trustees and issue a proper certificate to them therefor and to pay them the dividends that have accrued thereon since the 5th of April, 1878, the date of Tyson's death, *or* to pay them the market value of the several portions of stock at the respective dates of the several unauthorized transfers thereof by Simms and Tyson and by Simms alone, together with the amount of dividends that have been paid since Tyson's death to other stockholders on the same number of shares. *Telegraph Company vs. Davenport,* 7 *Otto,* 369 ; *Pollock vs. National Bank,* 3 *Selden,* 274. To the end that such relief may be granted the complainants, the decree appealed from will be reversed and the cause remanded.

*Decree reversed and*
*cause remanded.*

(Decided 12th May, 1880.)