KILLEN *v.* HOUSER

[No. 314, September Term, 1964.]

*Decided May 26, 1965.*

The cause was argued before PRESCOTT, C. J., and HAM-MOND, HORNEY, SYBERT and OPPENHEIMER, JJ.

*Ewing C. Whitaker* for appellant.

*James R. Bucher,* with whom were *Sasscer, Clagett & Powers* and *Jerrold V. Powers* on the brief, for appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

For the first time in the turbulent history of the George Washington Cemetery,[1] the rights of the lot owners emerge into legal cognizance. Houser, the appellee, filed a bill of com-

---

1. See Killen v. Geo. Wash. Cemetery, 231 Md. 337, 190 A. 2d 247 (1963) footnote 1 at 338.

plaint in the Circuit Court for Prince George's County against Killen, the appellant, alleging they were both trustees of the Care Fund of the George Washington Cemetery, Inc. (the Cemetery Company) and that Killen had violated his trust in converting a portion of the trust funds in the amount of $16,000 to his own personal use and in causing the unlawful investment of trust funds in an unsecured promissory note of one Abe Hoffman in the amount of $28,000. Killen demurred and answered, his demurrer was overruled, testimony was taken, and Judge Bowen entered judgment against Killen for both the amounts claimed, with interest. In this appeal, Killen contends the trial court erred in overruling the demurrer; that evidence was improperly admitted at the trial; that the appellant's motion for a directed verdict at the close of the appellee's case should have been granted; and that the court committed other reversible errors in the trial.

I

The bill alleges that, in 1949, Killen became one of the two trustees of a Perpetual Care Fund, the principal of which was to be invested in securities which are legal investments for trustees in Maryland, and the income of which was to be paid to the Cemetery Company. Two specific violations of Killen's duty as trustee are alleged and the bill asks that Killen be required to restore to the trust such amounts as he cannot properly account for. Killen contends that the demurrer to the bill should have been sustained, because the alleged trust is too indefinite, because there is no certain group of beneficiaries, because the beneficiaries were not joined as parties, because Houser does not allege how he was appointed as trustee, and because his predecessor trustee was not joined as a party.

For the purposes of demurrer, all well pleaded facts alleged in the bill, together with the inferences properly drawn therefrom, are accepted as true. *Kimmel v. W. T. Grant Co.,* 233 Md. 466, 197 A. 2d 122 (1964) ; *Brack v. Evans,* 230 Md. 548, 187 A. 2d 880 (1963) ; *Bldg. & Sav. Assn. v. Gorsuch,* 180 Md. 185, 189, 23 A. 2d 672 (1942). A bill of complaint, like other pleadings, should not include matters of evidence or matter of which the court may take notice ex officio. Maryland Rule 301 b.

The amended bill alleges that the trust was of a Perpetual Care Fund, under a trust agreement, for the purpose of care and maintenance of portions of the cemetery. To constitute an express private trust, there must be a fiduciary relationship with respect to property, subjecting the person by whom title to the property is held to equitable duties to deal with the property for the benefit of another person or persons. The trust arises as a result of a manifestation of an intention to create it; technical words are not required; it is enough if the intention to create a trust is apparent, and if the creator of the trust is competent to make it. *Waesche v. Rizzuto,* 224 Md. 573, 583, 168 A. 2d 871 (1961) and authorities therein cited; Restatement, Second, *Trusts 2d,* § 2.

> "Whether a trust has been perfectly created is largely a question of fact in each case, and the court, in determining the fact, will give effect to the situation and relation of the parties, the nature and situation of the property, and the purposes or objects which the settlor had in view." *Dougherty v. Dougherty,* 175 Md. 441, 448, 2 A. 2d 433 (1938).

The bill alleges a fiduciary relationship arising out of a trust agreement. The parties to the agreement are not stated, but the law presumes that parties to a contract are legally competent to make it. *Piraino v. Betka,* 218 Md. 548, 147 A. 2d 712 (1959) ; *Bollack v. Bollack,* 169 Md. 407, 410-411, 182 Atl. 317 (1935). The substance of the agreement, insofar as it is relevant, is set forth in the bill. The purpose of the alleged trust is clear—the care and maintenance of portions of the cemetery. If the trust is valid, it is immaterial, for the purposes of pleading, if it was created by the Cemetery Company or another legal entity. The agreement is an essential evidentiary part of the appellee's case, but not of his bill. The allegation that the appellee is a trustee under the agreement is sufficient; the manner of his appointment is a matter of evidence.

There is no express allegation in the bill as to who are the beneficiaries of the trust, but the peculiar legal position of the owners of cemetery lots is a recurrent theme in our decisions.[2]

---

2. E.g., Hill v. Towson Realty, Inc., 221 Md. 389, 157 A. 2d 796

In *Abell v. Green Mount Cemetery*, 189 Md. 363, 367-368, 56 A. 2d 24 (1947), we took judicial notice of some of the factual characteristics of cemetery lot ownership. The Maryland Legislature has taken cognizance of trusts for the perpetual care of cemetery lots in expressly providing that no grant or conveyance inter vivos or device or bequest for such purpose shall be held void as offending the rule against perpetuities. Code (1957), Article 93, §§ 345, 358. There is at least an inference that the term "Perpetual Care Fund" when used, as it is in the bill before us, in connection with the care and maintenance of portions of a cemetery, means, prima facie, that the fund is to be held in trust for the care of cemetery lots which have been sold to individuals for the interment of their dead. See *Gregory v. Chapman*, 119 Md. 495, 508-09, 87 Atl. 523 (1913), and Jackson, *The Law of Cadavers*, 332 (2d ed. 1950).

From this inference which we draw from the express allegations of the bill, it follows that the trust relates to the members of a definite class—the owners of the individual lots. A class of persons is sufficiently definite to be the beneficiaries of a trust if the identity of all the individuals comprising its membership is ascertainable. Restatement, Second, *Trusts 2d,* § 120, comment a. The owners of lots in a cemetery meet this test. See *Brown v. Maplewood Cemetery Ass'n,* 85 Minn. 498, 89 N. W. 872 (1902).

We do not agree with the appellant that the beneficiaries of the trust here involved are necessary parties to a suit brought against a co-trustee for malfeasance. Maryland Rule 205 b 1, which the appellant cites, relates to representation by a trustee of a beneficiary in a sale of trust property where the instrument gives the trustee the right to sell and to give receipts. In a suit such as this, the trustee is seeking to recover assets for the benefit of the trust and in such an action joinder of the beneficiaries on whose behalf the trustee is acting, is unnecessary. *Stewart v. Firemen's Ins. Co.,* 53 Md. 564, 574 (1880).

---

(1960); Abell v. Green Mount Cemetery, 189 Md. 363, 56 A. 2d 24 (1947); Silverwood v. Latrobe, 68 Md. 620, 13 Atl. 161 (1888); Reed v. Stouffer, 56 Md. 236 (1881); Partridge v. First Ind. Church, 39 Md. 631 (1874). See also Diffendall v. Diffendall, 239 Md. 32 (1965).

Neither *Cottman Co. v. Trust Co.,* 169 Md. 595, 182 Atl. 551 (1936) nor *Noel v. Noel,* 173 Md. 152, 195 Atl. 315 (1937), cited by the appellant, involved a situation comparable to the allegations of the present bill. In *Cottman,* there was a question of the rights of the bondholders under a debenture agreement in respect of insurance money; it was held the bondholders were represented by the trustee and were not necessary parties to the suit. In *Noel,* it was held that, where there is a conflict of interest, the beneficiary, as well as the trustee, is a proper party. The general rule, here applicable, was stated as follows:

> "Where a person sues or defends in equity in a fiduciary capacity, the necessity of making the beneficiary a party depends upon whether or not there may exist any conflict of interest. As a general rule, the fiduciary represents the beneficiary in suits which relate to the fiducial relation, and it is unnecessary for the beneficiary to be joined as plaintiff or defendant, if there is no conflict of interest between the fiduciary and the beneficiary, nor among the beneficiaries themselves. *Miller's Equity Proc.,* secs. 44, 30; *Van Bokkelen v. Tinges,* 58 Md. 53; *Stoll v. Smith,* 129 Md. 164, 98 A. 530." 173 Md. at 162-163.

The appellee's predecessor trustee may have been a proper party to the suit, but he was not a necessary one. The bill alleges that the appellant personally appropriated part of the trust funds to his own use and caused another portion to be unlawfully invested. It does not appear from the bill that the predecessor trustee participated in either of these actions. There is a further allegation that the appellant has failed to account for the assets of the trust; no such charge is made as to the predecessor trustee. The appellant had the right to move that the predecessor trustee be made a party, Maryland Rule 282, but the bill is not defective for failure to join him. One trustee can maintain a suit against the other to compel him to perform his duties under the trust. Restatement, Second, *Trusts 2d,* § 200 comment e.[3]

---

3. In Jones, Exec. v. Selvaggi, 216 Md. 1, 139 A. 2d 246 (1958) cited by the appellant, the holder of the assets was a transferee,

The demurrer to the amended bill was properly overruled.

II

At the hearing certain facts were uncontradicted. Killen became the owner of all the stock of a cemetery corporation known as Washington Memorial Park, Inc. (the Memorial Park) in 1947 or 1948 and actively participated in its management as an officer and director, with certain of his relatives, until February, 1957. At that time, he sold the stock of the Memorial Park to Houser and to one Mr. Harold I. Miller. In 1952 or '53, at a time when Killen owned all the stock of Memorial Park, Mr. (now Judge) Ralph G. Shure, the counsel for Memorial Park, formed the Cemetery Company as managing and selling agent for the Memorial Park. The Memorial Park owned the land.

On July 1, 1953, a "depository agreement for perpetual care" was entered into between the Park, the Cemetery Company, and Messrs. Killen and Shure as Trustees. Killen at that time was president of both the Memorial Park and the Cemetery Company. The depository agreement recites that the Memorial Park had acquired the title to a tract of land in Prince George's County of approximately 100 acres and that the Cemetery Company, as lessee and operator, proposes to subdivide, improve and sell the land and "to perpetually maintain" it as a burial ground to be known as George Washington Cemetery. The agreement provides that a sum equal to 10% of the gross proceeds of funds arising from the sale of sections or lots in the cemetery shall be set apart and shall constitute a Perpetual Care Fund for the preservation of the ground and repair; the last 10% of the purchase price of the sections or lots is to be deposited with the Trustees and the net income is to be paid by the Trustees to the Cemetery Company. The Cemetery Company agrees to use the income so received for the perpetual care and preservation of the grounds and the repair and renewal of the buildings and property owned by the Memorial Park. The principal of the Perpetual Care Fund is to be invested by

and his joinder was necessary for the court to obtain jurisdiction over the assets; here, the basis of the bill is not failure to deliver assets, but appropriation of part of the assets to the use of the appellant-trustee and unlawful investment of other trust assets.

the Trustees in such securities as shall constitute a legal investment for trustees in the State of Maryland and no investment is to be made unless approved by the Trustees and the Cemetery Company.

The agreement provides that the Trustees make no covenant or representation respecting the rights of purchasers of sections or lots in the cemetery. It is expressly stated that the Trustees have the right to resign, upon giving sixty days' written notice of such intention to the Cemetery Company and the Memorial Park, and both of these corporations agree that, in the event of such resignations, they will appoint new trustees.

Houser testified that he is president of the Cemetery Company, is familiar with its records and knows that the Perpetual Care Fund was operated on the basis of the rules and regulations of the Cemetery Company. He believes that these rules and regulations have been in effect since the early mid-forties and that they were originally regulations of the Memorial Park. These rules and regulations were offered in evidence and provide, among other matters, that the 10% of the purchase price of lots deposited in the Perpetual Care Fund "shall be used for the care of that portion of the cemetery so sold." There is a provision that any cost of care resulting from a departure by any purchaser from the rules and regulations established by the Cemetery Company in excess of the cost of care provided for by the Perpetual Care Fund shall be borne by the purchaser. The rules and regulations contain various provisions as to the rights of and restrictions upon the purchasers of the lots, including the selection and installation of monuments, vaults and mausoleums, grave and lot markers and planting on grave sites.

There was some testimony to the effect that there had been an earlier perpetual care fund established by the Memorial Park. Mr. Shure's resignation as trustee, addressed to the Cemetery Company, dated December 19, 1957, was introduced in evidence but there was no formal evidence offered as to Houser's appointment as Mr. Shure's successor trustee.

The $16,000 item referred to in the bill of complaint, it was developed in the testimony, is a note of Killen, dated August 22, 1949, payable to the Memorial Park one year after date. Houser testified this was included in the assets turned over

to him by Mr. Shure. Killen testified that he had signed the note and in exchange had received $16,000 in cash from the Memorial Park. He had not paid it because, according to his understanding, it was part of the accounts receivable assumed by the Cemetery Company, which took over the obligation. He contends that the records of the Cemetery Company should show the assumption of the obligation but no documentary evidence to that effect was offered. Killen testified that he had done much work for the Cemetery Company without payment.

The $28,000 item referred to in the bill is an unsecured promissory note of Abe Hoffman, now deceased, dated August 1, 1956, payable to the Cemetery Company, with principal and interest at four percent, all due ten years from date. The note is not endorsed. With it, there is a collateral assignment to the Cemetery Company of salesman's commissions due and numbered cemetery lots. Houser testified that he received this note from Mr. Shure when he transmitted certain assets to the Trustees under the depository agreement. Hoffman died in 1958 and Houser is the administrator of his estate, which has no "proven" assets. Houser has not been able to find that any payments of interest or principal have been made on this note. Killen testified that Hoffman was a salesman of lots for Memorial Park and that, apparently, some commissions were due him from the company and Hoffman assigned these commissions in support of the note.

Among the exhibits offered in evidence is a letter from Mr. Shure to Houser, dated December 9, 1957, which refers to a memorandum from Mr. Shure concerning the Perpetual Care Fund as of August 1, 1957. The letter states the memorandum was forwarded to Houser at that time, but the memorandum was not offered in evidence. There was another letter from Mr. Shure, dated April 3, 1958, to Mr. Miller, as president of the Cemetery Company, written after Mr. Shure's notice of resignation. This letter recites that Mr. Shure is turning over certain assets which are listed, "which were left with me." These assets included the $16,000 and $28,000 notes, to which reference has been made.

In his opinion, Judge Bowen found that there was a trust agreement contained in the depository agreement, of which the

rules and regulations of the Memorial Park were made a part, that the trust was to consist of 10% of the proceeds of sale of the lots, and that the beneficiaries of the funds were the purchasers of grave sites in the cemetery, their heirs and successors, and "the public in general." Judge Bowen found that the fund was to be administered initially by the owner of the cemetery corporation (the Memorial Park) but that the fund was afterwards transferred to the Trustees under the depository agreement. He found, further, that both Killen's note for $16,000 and the Hoffman note for $28,000 were assets which the Memorial Park originally was holding for its care program, as required by its regulations, and that these assets were transferred to the Trustees. He held that Killen, as trustee, could not continue to hold his note which was in default and upon which nothing had been paid and that he is liable for any loss which the corpus of the trust sustained. As to the $28,000 note of Hoffman, Judge Bowen found that the note clearly was not within the list of trust investments and the Trustees had no right to accept it. The judge found that Killen's explanation of this note to the effect that it was not a note at all but merely an indication that there would be due to the fund the sum stated upon the consummation of a sale by Hoffman, as a result of which he would be entitled to commissions, was incredible. Other contentions raised by the appellant were considered and rejected by the judge. He concluded that Killen was a trustee and was obligated to abide by the clear terms of the agreement under which he was acting, that he violated his duties as fiduciary in respect of each note and was liable therefore for the face amount of the notes with interest from their respective dates.

We agree with the trial judge, under the authorities referred to in the first portion of this opinion, that there was clear evidence of the creation of a definite and valid trust under the depository agreement, of which the rules and regulations of the Memorial Park were a part, for the benefit of the owners of the cemetery lots. Whether or not the public in general was also a beneficiary, at this point at least, is not material.

There are, however, so many gaps in the testimony, so many ambiguities calling for explanation, that, in our judgment, ad-

ditional evidence is essential before a final determination of the case can be made. Among the matters on which, in our opinion, there should be additional testimony, is how and when Houser became a successor trustee upon Mr. Shure's resignation; the creation, terms and assets of the first alleged trust for perpetual care of the lots; the reasons, if any, why Killen's note was never collected or, in the alternative, why demand was not made upon the Memorial Park or the Cemetery Company for its payment, if either company was liable therefor; whether or not the acceptance of the Hoffman note was submitted to either company for approval; and, in any event, why that note was accepted by the Trustees.

We do not pass at this time upon the various evidentiary questions which have been raised, as the taking of additional testimony may eliminate the questions when another hearing is held.

We regard it as essential that Judge Shure should be given the opportunity to testify as to the various matters in which it is stated in the record that he participated, and to produce, if possible, his records while he acted as trustee either under the depository agreement or under any prior perpetual care agreement. We wish to make it clear that the testimony shows, and counsel stated in the argument before us, that Judge Shure's failure to appear at the hearing was not due to any unwillingness on his part but was caused by some misunderstanding as to the time of the hearing and Judge Shure's engagement in his judicial duties when the hearing took place.

Therefore, in accordance with Maryland Rule 871 a, as it appears to this Court that the substantial merits of the case will not be determined by affirming, reversing or modifying the judgment and that the purposes of justice will be advanced by permitting further proceedings with the introduction of additional evidence or otherwise, we remand the case for such further proceedings.

> *Case remanded, without affirmance or reversal, for further proceedings consistent with the views expressed in this opinion; costs to abide the result.*