KILLEN, ETC. *v.* HOUSER, ETC.

[No. 319, September Term, 1967.]

*Decided October 9, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Ewing C. Whitaker* for appellant.

*Martin H. Freeman,* with whom were *Sasscer, Clagett, Powers and Channing* and *Jerrold V. Powers* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

In 1960 Albert Houser, as successor trustee of the Care Fund of George Washington Cemetery, filed a bill against Harold Killen alleging that Killen was a co-trustee with him of that fund "of which the principal was and is to be invested by the Trustees in sound investments to protect income" which was to be used for the care and maintenance of cemetery lots, and that Killen "in violation of his said trust, did wrongfully appropriate and convert a portion of the said trust funds in the amount of $16,000.00 to his own personal use and purpose,"

and further did cause and participate "in the investment of funds in his hands under the trust agreement in an unlawful and unapproved investment in the form of an unsecured promissory note of one Abe Hoffman in the amount of $28,000.00."

In *Killen v. Houser*, 239 Md. 79, this Court upheld the overruling below of a demurrer to the bill, holding that it sufficiently alleged against all necessary parties a fiduciary relationship arising out of a trust agreement. The Court pointed out that it was established or conceded at the hearing of the case that Killen in 1947 or 1948 acquired all the stock of a company, herein to be referred to as Memorial Park, which owned a cemetery, and controlled and managed it until he sold it to Houser in 1957. In 1952 or 1953 Killen's and Memorial Park's lawyer, Ralph G. Shure, now a judge of the Circuit Court for Montgomery County, incorporated another company, to be referred to as the Cemetery Company, to act as managing and selling agent for Memorial Park. The Court went on to recite the uncontradicted facts as follows:

> "On July 1, 1953, a 'depository agreement for perpetual care' was entered into between the Park, the Cemetery Company, and Messrs. Killen and Shure as Trustees. Killen at that time was president of both the Memorial Park and the Cemetery Company. The depository agreement recites that the Memorial Park had acquired the title to a tract of land in Prince George's County of approximately 100 acres and that the Cemetery Company, as lessee and operator, proposes to subdivide, improve and sell the land and 'to perpetually maintain' it as a burial ground to be known as George Washington Cemetery. The agreement provides that a sum equal to 10% of the gross proceeds of funds arising from the sale of sections or lots in the cemetery shall be set apart and shall constitute a Perpetual Care Fund for the preservation of the ground and repair; the last 10% of the purchase price of the sections or lots is to be deposited with the Trustees and the net income is to be paid by the Trustees to the Cemetery Company. The Cemetery Company agrees to use the income so received for the perpetual care

and preservation of the grounds and the repair and renewal of the buildings and property owned by the Memorial Park. The principal of the Perpetual Care Fund is to be invested by the Trustees in such securities as shall constitute a legal investment for trustees in the State of Maryland and no investment is to be made unless approved by the Trustees and the Cemetery Company." [239 Md. at 87-88]

There was testimony at the first hearing that Killen borrowed $16,000 in cash from a prior care fund, for which he gave the promissory note for that amount here involved, and that the loan was authorized by the board of Memorial Park which had segregated the care fund and at that time acted as trustee thereof. There was also testimony that the $28,000 note represented monies that should have gone into the care fund in cash but which Memorial Park and Cemetery Company permitted Abe Hoffman, a star salesman of cemetery lots in volume, to retain in exchange for his promissory note. After the first trial the chancellor held that it was immaterial whether the $16,000 note was a proper investment when made, under the published regulations of Memorial Park relating to the segregated care fund, held in trust by the Park for lot owners, and that the note came into the hands of Killen and Shure, trustees under the 1953 agreement, by reason of the fact that it was a part of the care fund. As to the $28,000 note, Judge Bowen said:

"The inescapable inference * * * is that Hoffman was in the habit of retaining ten per cent of the cash paid on his sales and giving his personal note to the care fund, and that this finally has accumulated to some twenty-eight thousand dollars * * *." [Brief for Appellant at E. 56 (Record at 75-76), *Killen v. Houser,* 239 Md. 79]

Judge Bowen concluded that Killen was a trustee,

"and that as a trustee he was obligated to abide by the plain terms of the agreement under which he was acting. The Court further finds that the two investments which are the subject of this proceeding, first, do not

meet the requirements of the statute [governing trust investments in Maryland, the standard specified in the agreement], and second, were not accepted and held in the trust with the mechanical safeguards of concurrence by the Board of Directors and the trustees. But even had such concurrence been obtained, this would still have not relieved the trustee from responsibility because these investments do not qualify and were made by the trustee or accepted and held by the trustee, in the case of his own personal note, in violation of his legal obligations under the contract which created the trust. The Court further finds that these investments have not been paid and that inasmuch as they were *not proper investments, the trustee is responsible for the loss which the trust has sustained.*" [Brief for Appellant at E. 59 (Record at 79), *Killen v. Houser,* 239 Md. 79]

Judge Bowen granted Houser as trustee a judgment against Killen for $62,500, that is, for $16,000 and interest, plus $28,000 and interest.

In reviewing Judge Bowen's first holding, we neither affirmed nor reversed but remanded the case for additional evidence, saying:

"Among the matters on which, in our opinion, there should be additional testimony, is how and when Houser became a successor trustee upon Mr. Shure's resignation; the creation, terms and assets of the first alleged trust for perpetual care of the lots; the reasons, if any, why Killen's note was never collected or, in the alternative, why demand was not made upon the Memorial Park or the Cemetery Company for its payment, if either company was liable therefor; whether or not the acceptance of the Hoffman note was submitted to either company for approval; and, in any event, why that note was accepted by the Trustees." [239 Md. at 91]

The testimony produced at the hearing upon remand, including Judge Shure's testimony, showed: (1) that at a joint meet-

ing of all the directors of the Memorial Park and the Cemetery Company Mr. Shure's resignation as trustee of the Perpetual Care Fund was accepted and Houser was appointed successor trustee "with full powers to investigate or take actions necessary to fulfill the fiduciary responsibilities of a trustee"; (2) that the cemetery involved had originally been owned by the Northwest Park Cemetery Company and as a result of a receivership of Northwest a perpetual care fund was set up to be administered under the supervision of the court to protect the lot owners and that later this fund or a subsequent fund was administered by Hannum and Turner, who then owned the cemetery, and that the $16,000 which was borrowed by Killen to complete the purchase of Memorial Park came from the Hannum and Turner care fund. Some residue remained in the fund after the borrowing by Killen and deposits were made from time to time in the fund. Another loan to Mrs. Killen was made from the fund. Shure and Killen acted informally as trustees of the fund from 1950 until the formal agreement of 1953 and opened an account in 1950 in the Suburban Trust Company. Houser, who had had a certified audit made of the care fund in 1958, said the first deposit in the new account of $583.50 represented the balance in the care fund at that time, but Judge Shure's recollection—he testified his recollections were vague and his records few if any—was that it represented the first "last 10%" of sales coming in after Shure and Killen became trustees in 1950; (3) the terms of the trusts of the care funds up to 1953 were those established by the cemetery companies' published regulations; (4) that Killen's note for $16,000 was never sued on because he said he could not pay it and, apparently, it was not thought that either Memorial Park or the Cemetery Company owed the money; (5) that acceptance of the Hoffman note was not submitted to either company for approval; and (6) that the trustees apparently accepted whatever the companies gave them, including notes, and had attempted to collect those notes (and in some instances had done so). They, or at least Mr. Shure, had made faint attempts to collect the $16,000 and $28,000 notes.

Judge Bowen, after considering the testimony offered on remand, adhered to his original views, except that he reduced the

judgment for $62,500 by $1,844.95, the net recovery by Houser from the Abe Hoffman estate on the $28,000 note.

In the present appeal Killen makes the contentions that the trial judge erred in permitting Houser to testify from the corporate books and records without showing they were kept in the ordinary course of business, as Code (1967 Repl. Vol.), Art. 35, § 59, specifies, and that it was error to find Killen liable on the $16,000 note and for the amount of the $28,000 note.

We find no merit in these contentions. Houser received the corporate records when he purchased the companies and has been their custodian since. The records were those that normally and customarily are kept by corporations in ordinary course. There was nothing to show these were not the records received by Houser or that they were not bona fide and unaltered. The statute does not specify that the custodian of the record be he who was such at the time the record was made. If it did, it would lose much of its utility and effectiveness.

We find no error in holding Killen liable on the $16,000 note. He became trustee in 1950 and for ten years held as fiduciary a note of which he was the maker. This holding in the trust of his own past due note permitted the finding that he was liable to the trust for $16,000 and interest. *Veterans' Administration v. Hudson*, 169 Md. 141.

The trial judge in our view was justified in finding that the $28,000 note had been accepted by the trustees as a trust asset and that it represented the last ten per cent of sales made by Hoffman.

Clearly the asset the trustees received and accepted should have been cash in the amount of $28,000 rather than the promise of an individual to pay $28,000. The promise was an improper trust asset under the terms of the trust agreement and the chancellor properly could find, as he did, that Killen as a trustee is liable for the loss suffered by his acceptance of it.

*Judgment affirmed, with costs.*