GREENBELT HOMES, INC., ET AL. *v.* BOARD OF
EDUCATION OF PRINCE GEORGE'S
COUNTY, MARYLAND

[No. 687, September Term, 1966.]

*Decided January 5, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*David Reich* for appellants.

*Paul M. Nussbaum* for appellee.

HAMMOND, C. J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 361, *infra.*

We have in this appeal the same effort in more refined and sophisticated form to thwart a Board of Education's choice of

a school site, disapproved of by the appellants, that was made unsuccessfully in *Dixon v. Carroll County Board of Education,* 241 Md. 700, and *Gaither v. Board of Education of Howard County,* 247 Md. 629.

The appellants are a corporation (GHI) which owns 240 acres of land and 1,579 residences thereon situate in the City of Greenbelt in Prince George's County, and two individuals who are citizens, voters and taxpayers in the County. They jointly brought a bill of complaint that sought to have declared void, both temporarily and permanently, a contract by the Board of Education to purchase a site for a high school. The Board had already paid the purchase money and received its deed and, therefore, demurred to the bill on the ground of mootness. At the initial argument the Board sought to amend its demurrer to include an allegation that the bill did not make out a case on the merits. Judge Powers would not permit the amendment and overruled the demurrer because mootness did not appear on the face of the bill. The Board then answered and moved for summary judgment, with supporting affidavits, again almost entirely relying on mootness. Judge Powers denied the summary judgment but indicated that he would sustain a demurrer, if one were filed, and authorized the Board to withdraw its answer to the bill and file a demurrer. The Board did both, filing a demurrer which relied on five grounds, two of which are applicable and apposite, (1) that the bill failed to state a cause of action, and (2) that the allegations of the bill involve only an "educational matter" as to which the Board has exclusive jurisdiction. Each ground of demurrer was supported by a reference to a Maryland case or a section or sections of the Code.

The appellants filed a brief opposing the sustaining of the demurrer, claiming principally that its allegations lacked the necessary specificity required by Maryland Rule 345 b. The Board filed a statement of "Additional Points and Authorities" in support of its allegation in the demurrer that "the bill of complaint fails to state a cause of action," which was quite specific in pointing out that the bill stated only conclusions of the appellants that the Board acted arbitrarily, capriciously and fraudulently in acquiring the challenged site, without alleging any facts indicating that its actions were as characterized. Judge Powers

held that the Statement of Additional Points and Authorities constituted a part of the demurrer and that the demurrer as supplemented went into sufficient detail, and then sustained the demurrer without leave to amend.

The appellants now argue that Judge Powers erred to their prejudice by exercising powers he did not actually have in permitting the withdrawal of the motion for summary judgment and the filing of the second demurrer. They say: "Such an extended preliminary procedure does not enhance justice," although they would seem themselves to negate any prejudice when they say:

> "Since the lower Court was of the opinion that the Bill of Complaint was insufficient, it could and should have made that ruling on Appellee's Motion for Summary Judgment. Under the lower Court's theory none of the facts alleged in the Bill of Complaint was material. Their denial, therefore, by Appellee should have been of no consequence. A motion for summary judgment where there is no genuine issue of fact takes on the same function as a demurrer."

We think the trial court had power to act as he did and that he did not abuse his discretion in so acting. Rule 320 a 4 directs the court at any stage to "disregard any error or defect in * * * pleadings * * * which does not affect the substantial rights of the parties." Rule 320 c 1 permits "any amendment" to be made at any time before final judgment and decree in a case before the court without a jury. Rule 320 d 1 b provides that "an amendment shall not be made without leave of court but leave to amend shall be freely granted in order to promote justice." Judge Powers' leave to file the second demurrer was in effect a granting of the Board's motion to supplement the original demurrer which he had once denied. The power to permit amendment by withdrawal of a pleading has long been recognized. *Mitchell v. Smith,* 4 Md. 403; *Somervell v. King,* 1 Harr. & J. 206. The docket entries and the memorandum-brief of the appellants show that they made no objection or challenge below to the right of the court to act as he did, and here they necessarily acknowledge that they were not

prejudiced by the procedural course of events when they admit that if the court reached the right result on the merits in his final ruling he should have reached that same result earlier on the Board's motion for summary judgment.

The appellants can fare no better on the merits. If all the allegations of fact relied on by the appellants in their bill and on the motion for summary judgment are accepted at full face value, they constitute no reason why the Board's statutorily conferred exercise of judgment and discretion in the selection of a school site should be interfered with by a court. We said in this connection in *Dixon* (pp. 703-04 of 241 Md.) :

> "It is clear that the County board is vested with discretionary power and authority in connection with the building of new schools. See §§ 3, 55 and 56 of Art. 77 of the Code (1965 Replacement Vol.). In *Wiley v. School Comm'rs,* 51 Md. 401, 404-05, the Court said :
>
> > 'If the proposed act in establishing the high school be within the scope of the authority delegated, as it clearly is, it is not competent to [*sic*] a court of equity [nor for a court of law by mandamus] to restrain the exercise of the discretion of the commissioners given by the statute, unless it be clearly shown that the power has been, or is about to be corruptly and fraudulently used. * * * Where the Legislature has confided the power of determining as to the wisdom and expediency of an act authorized to be done, to a board of public functionaries, with them the decision * * * must rest. And that is the case here. The Board of County School Commissioners being clothed with power, in their discretion, to establish a county high school, their determination upon the subject cannot be reversed or controlled by a court of equity [or law].'
>
> To the same effect are *School Commissioners v. Morris,* 123 Md. 398; *School Com. of Car. Co. v. Breeding,* 126 Md. 83, 88; and *Coddington v. Helbig,* 195 Md. 330 (a case analogous to the instant case in that

the protestants there sought to prevent the building of new schools and the closing of old ones), in which the Court held there was no proper allegation of illegality or fraud and that the broad authority given to build new schools where needed negated a finding that the bill alleged such a gross abuse of discretion as to amount to a breach of trust." (Footnote omitted.)

The fact picture painted by the record reveals that in 1964 the Board contemplated building three schools—an elementary, a junior high and a high school—in the Greenbelt area. In the fall of that year three parcels of land were under consideration. The one contemplated for the high school was Parcel 15 of Greenbelt—an area adjacent to the Capital Beltway and near Greenbelt's park and lake—and the other two parcels, apparently contemplated for the other two schools, were in Parcel 1 and Parcel 2 at the other end of Greenbelt between the Baltimore-Washington Parkway and the property owned by GHI. Both Parcel 15 and Parcels 1 and 2 were owned or controlled by Charles S. Bresler and Theodore N. Lerner ("Bresler-Lerner").

The City of Greenbelt was then engaged in adopting a Master Plan for the development of the City consistent, say the appellants, "with the ideals, concepts and vision of The President and Congress of the United States in their establishment in 1935 of the planned community of 'Green Town' (now known as Greenbelt) in Prince George's County." This Master Plan envisioned the high school in Parcel 15, and the City Council of Greenbelt unanimously made the same recommendation. The Board, desirous of cooperating with Greenbelt, sought and obtained the approval of the State Superintendent of Schools, required by Code (1957), Art. 77, § 56, of the Parcel 15 site and authorized its representative to negotiate with Bresler-Lerner for its acquisition. An agreement on price could not be reached, and in December 1965 the Board filed two condemnation proceedings to acquire some 42 acres in Parcel 15, some 10.5712 acres in Parcel 1 and some 9.4430 acres in Parcel 2. In July 1965 Bresler-Lerner suggested that they would lower their price for the land in Parcel 15 to the Board's bid if Green-

belt would agree not to object to Bresler-Lerner's application for denser zoning on Parcels 1 and 2 (aggregating some 230 acres) than the City's Master Plan contemplated. The Board arranged meetings between Bresler-Lerner and officials of Greenbelt to see if this were feasible. On October 18, 1965, the City Council of Greenbelt rejected the proposal and in its resolution of rejection moved "that the Board of Education be urged to pursue the acquisition of the high school site in Parcel 15."

Bresler-Lerner then tried a new approach, offering to transfer to the Board a tract of approximately 55 acres in Parcels 1 and 2, upon which the Board could build an elementary, a junior high school and a high school (a "school-park complex") for a total price of some $440,000. Because the tract was owned by trustees who had recently sold lots nearby to individuals for $17,500 an acre and who feared they could not justify a sale to the Board at $8,000 an acre, Bresler-Lerner proposed to sell the Board half of the 55-acre tract for $16,000 an acre and to donate to it the other half, because this arrangement "could result in tax benefits to Bresler-Lerner."

On December 3, 1965, the Superintendent of Schools for Prince George's County wrote the City Manager of Greenbelt as follows:

> "On Monday, November 29, when the Board of Education made its on-the-site inspection of the various land tracts under consideration for schools in the City of Greenbelt, I indicated to you that this item would not appear on the agenda of the Board meeting which was held on Tuesday, November 30, 1965.
>
> "I did so at that time knowing that the recommendation of our staff to the Board would recommend a delay, pending the securing of data from our engineers as to the cost of site development. In either case the site for the senior high school would involve a considerable amount of land removal, and it was the feeling that in addition to the cost of the land the Board should have some opportunity of knowing what site preparation was involved.

"We also knew that we would be compelled to secure from the owners of the site an extension of time, as their offer to sell the 55 acres of ground in parcels 1 and 2 was contingent upon a decision date of November 30.

"At the meeting on Tuesday, the Board contacted Mr. Charles Bressler, one of the owners, requesting from him an assurance that an extension of time would be available. Mr. Bressler replied that he could speak for himself and for Mr. Lerner but that he could not guarantee that the trustees of the Gudelski estate would be willing to grant such an extension. The reason for this is that two parcels of land from the holdings of this group of owners have been sold at a price of $17,500 an acre, and Mr. Bressler was quite frank in stating that he was dubious as to the attitude of the Orphans Court if he and the trustees should now bring before that body a request that they approve and ratify the sale of 55 acres of ground at $8,000 per acre.

"Failing to secure an extension of time, the Board notified the attorney for the owners that they would accept the offer made by the owners at a previous meeting, subject to approval by the State Superintendent of Schools and the securing of favorable test borings.

"As you well know, the Board and, I believe, representatives of your group who were present on Monday agreed that the junior high school site along the lake was not a good site and certainly one which could not be adapted for the construction of a junior high school. At the same time, the land on the opposite side of the lake, which your group was interested in having the Board purchase, would have required the acquisition of more land than contemplated and that this land would have cost the Board $18,000 per acre.

"The Board was further advised by its engineers that the amount of land removal involved in building on the two sites along Sanitary Fill Road involved

less dirt removal than has been involved in the building of Kenilworth and Potomac High School.

"All of these factors together led the Board to make its decision. It was not the Board's intention to take action at their meeting, but the inability to secure a definite commitment granting the Board an extension of time left only one action; i.e., the purchase of the property in parcels 1 and 2.

"The Board has authorized me to provide you with this information so that you may have all the facts."

On February 24, 1966, the Board by a formal resolution reaffirmed its intention to buy the site in Parcels 1 and 2. On March 22, 1966, the State Superintendent of Schools wrote the Board that he had made a personal inspection of the Parcels 1 and 2 site, and also the Parcel 15 site, which he had previously approved, and that

"Based on this visit and the information which has been made available to me through your letters and previous visits of Mr. Myers to the sites it appears to me that all the sites are adequate and acceptable for the facilities proposed. Therefore, as far as I am concerned either plan is workable and can provide the necessary school housing. The choice of the site for the high school is a local matter and I feel certain that you and the Board of Education will make the choice which is in the best interest of all of the citizens of Prince George's County.

"I have previously approved the 32-acre site adjacent to the Capital Beltway [Parcel 15], and this letter is to be considered as my formal approval for the acquisition of approximately 62 acres adjacent to the Baltimore Washington Expressway [Parcels 1 and 2] for the creation of a school-park to house facilities for an elementary school (10 acres), a junior high school (20 acres), and a senior high school (32 acres)."

At its meeting on March 24, the Board was advised that the State Superintendent had approved the Parcels 1 and 2 site and

that GHI had written the Board that it "is still making its offer to provide a 10 acre site to the Board of Education for an elementary school *at the cost of securing its release from mortgage*" (emphasis supplied) and is still indicating its "opposition to the location of the high school in the general area along the Baltimore-Washington Parkway." The Board then reaffirmed by resolution its determination to accept the "Parkway sites" (some 62 acres in all) "at an average price of $8,000 per acre."

The Board then "requested that a release be made to the press of the step by step narration of why the Board reached the above decisions regarding the Greenbelt sites."

On June 22, 1966, settlement was made and the Board took title to the so-called Parkway sites. (The condemnation petitions had been dismissed.)

The heart of appellants' case is the allegation in paragraph 21 of their bill that:

> "In reversing its decision to buy Parcel 15 for a high school site, in being influenced by considerations other than the public interest in the selection of Parcels 1 and 2, and by substituting for its own judgment the pressures and influence which Bresler-Lerner were able to assert by reason of their ownership and/or control of Parcels 15, 1 and 2, [the] defendant [Board] has acted arbitrarily, capriciously and in breach of its trust as a public body."

No facts are alleged as to why the Board's decision to reject Parcel 15 as a site for the high school when it as prospective purchaser and Bresler-Lerner as potential sellers could not agree on price, and its decision instead to buy part of Parcels 1 and 2 for a school-park complex for three schools was not a reasoned, dispassionate, independent exercise of judgment in the interest of all the citizens of Prince George's County. The "considerations other than the public interest," claimed to have brought about the purchases in Parcels 1 and 2, were not specified. "The pressures and influence" of Bresler-Lerner, which appellants claim to have unduly influenced the Board, are said to be those arising from their owning or controlling both Parcel

15 and Parcels 1 and 2. This amounts in context to no more than saying that if A and B cannot agree on a price for one of B's properties which A originally liked and wanted and B offers A another piece of property, equally or more suitable, at a much lower price per acre, B has unduly and illegally influenced A. (The record shows that the asking price per acre for Parcel 15 was $18,000 an acre.)

Characterizations of acts or conduct, no matter how often or how strongly adjectively asserted, are, without supporting statements of fact (not evidence), conclusions of law or expressions of opinion. *Livingston v. Stewart & Co.*, 194 Md. 155. Allegation of fraud or characterizations of acts, conduct or transactions as fraudulent, arbitrary, capricious or as constituting a breach of duty, without alleging facts which make them such, are conclusions of law insufficient to state a cause of action. *Ragan v. Susquehanna Power Co.*, 157 Md. 521; *Edison Realty Co. v. Bauernschub*, 191 Md. 451; *Willoughby v. Trevisonno*, 202 Md. 442; *Lord Calvert Theatre v. Balto.*, 208 Md. 606; *Van Gorder v. Board*, 229 Md. 437.

Appellants earnestly urge upon us that their bill "forms the skeletal framework" which they are prepared to fill out with the flesh of facts if given the chance. It was incumbent upon them to supply in their bill sufficient flesh of fact to picture a body rather than a skeleton. This they did not do, and at the argument, when given the chance to do so, could not tell us what pertinent or significant facts, other than the inadequate ones alleged in their bill, they could supply if a trial were granted them.

Appellants' argument that "the final abdication of any sense of public responsibility was the * * * [Board's] action in accepting Parcels 1 and 2 at a fictitious and arranged price of $16,000 per acre for half the acreage instead of $8,000 per acre for the entire acreage," because, say appellants, that while the total price was the same the Board "as a public body should not have allowed itself to be made a vehicle for tax advantages to private owners of realty," is a grasping at straws. Tax avoidance (in contrast to tax evasion) is a frequent concern of many citizens of varying economic worth on numerous occasions and, entirely properly, continually gives form and color to countless

business transactions. If the Board's decision to buy part of Parcels 1 and 2 was freely and deliberately arrived at for sound reasons in the public interest, as the record strongly suggests, certainly it was not inappropriate or improper for the Board to acquiesce in the sellers' desire to arrange the sale in a way that would lessen tax consequences to the sellers.

Appellants' allegation that the site actually chosen by the Board will require widening of roads in residential areas and "will result in the irreparable destruction and impairment of valuable property rights" does not help them.

Public construction often necessarily requires widening of public roads and a citizen has no right to insist on the maintenance of an existing road width. What "valuable property rights," which appellants claim will be destroyed or impaired, are not specified nor is it told how this will be done or whether those rights are those common to all residents and taxpayers.

Judge Powers did not err in dismissing the bill.

*Order affirmed, with costs.*

BARNES, J. dissenting:

I dissent because, in my opinion (1) the allegations of fact in the bill of complaint, with all reasonable inferences from the alleged facts taken in favor of the plaintiffs, state a cause of action in equity against the Board and (2) the lower court abused its discretion in permitting the Board to withdraw its answer to the bill of complaint, file a second demurrer and "supplement" it with a trial memorandum, and then sustain the demurrer and dismiss the bill of complaint after the lower court had previously overruled the Board's demurrer and its motion for summary judgment.

(1)

It is well established, in ruling on a demurrer to a bill of complaint, that the truth of all material relevant facts properly alleged, together with the inferences which may reasonably be drawn from those facts, is admitted. *Killen v. Houser*, 239 Md. 79, 210 A. 2d 527 (1965) and prior Maryland cases cited in the opinion in that case. When applying this rule to the present case, it is my opinion that the bill of complaint is sufficient to

indicate, *prima facie,* that the Board did act arbitrarily, capriciously and in breach of its trust as a public body, as was alleged in paragraph 21 of the bill of complaint.

It is necessary to consider in some detail the allegations in the 21 paragraphs of the bill of complaint. The first three paragraphs describe the plaintiffs. Greenbelt Homes, Inc. is a Maryland corporation owning approximately 240 acres of land in the City of Greenbelt in Prince George's County on which are situated 1,579 homes owned by that corporation. It is a membership corporation composed of most of the 1,579 families occupying the homes located on the corporation's land. It is a taxpayer in Prince George's County and brings the suit in its own right as a taxpayer and on behalf of its members, who for the most part are citizens, voters and taxpayers of Prince George's County. Two individual taxpayers are also parties plaintiff, both of whom reside in Greenbelt.

Paragraph 4 describes the defendant, Board of Education of Prince George's County, Maryland (the Board), as a body corporate under the laws of Maryland which "is entrusted with administering the Public School System of the State of Maryland within the boundaries of Prince George's County, Maryland."

Paragraph 5 alleges that in September, 1964, the Board had under consideration the selection of a suitable site in the City of Greenbelt for a high school on either of two parcels of land: (1) Parcel 15—an area of approximately 35 acres adjoining the recreational park and lake of the City of Greenbelt adjacent to the Capital Beltway and (2) part of Parcels 1 and 2—part of an area of approximately 230 acres on the opposite end of the City of Greenbelt located between the Baltimore-Washington Parkway and the land owned by Greenbelt Homes, Inc. Attached as Exhibit 1 was a sketch of the City of Greenbelt showing the approximate location and boundaries of Parcel 15 and Parcels 1 and 2.

Paragraph 6 alleges that Parcel 15 and Parcels 1 and 2 are all owned or controlled by the same developer-builders, Charles S. Bresler and Theodore N. Lerner (Bresler-Lerner) and that Bresler-Lerner, beginning with September, 1964, "urged defendant (the Board) to select part of their Parcels 1 and 2 for the high school site rather than Parcel 15."

Paragraph 7 alleges that in October, 1964, the Board held meetings with the City Council of the City of Greenbelt "to determine where the City desired the high school site to be located."

Paragraph 8 alleges that also in October, 1964, the City of Greenbelt was in the process of adopting a Master Plan for the development of the City "consistent with the ideals, concepts and vision of The President and The Congress of the United States in their establishment in 1935 of the planned community" of Green Town (now called Greenbelt) in Prince George's County. In this Master Plan the proposed high school was recommended for "placement on Parcel 15 by reason of its location, the availability of established roads, its separation from the residential district proper with consequent less adverse effect upon traffic congestion and pedestrian safety, and its proximity to existing park and other recreational facilities." This Master Plan with Parcel 15 as the high school site was officially adopted by the City in March, 1965, and the Maryland-National Capital Park and Planning Commission made the same recommendations for Parcel 15 in its Area 13 Plan.

In Paragraphs 9 and 10 it is alleged that on November 10, 1964, the City Council of Greenbelt informed the Board that the Council "had voted unanimously for the high school site to be placed on Parcel 15" and thereupon the Board by its resolution duly adopted at its meeting on the same day, November 10, 1964, authorized Thomas S. Gwynn (Gwynn), Assistant Superintendent of Schools for Prince George's County, to negotiate with Bresler-Lerner for the acquisition of Parcel 15. As required by Code (1957) Article 77, section 56, the Board sought and obtained the approval of the State Superintendent of Schools to purchase Parcel 15 for a high school site.

In Paragraphs 11 and 12 it is alleged that the Board was unable to contract with Bresler-Lerner on a fair valuation for Parcel 15, and pursuant to authority conferred by Code (1957) Article 77, section 58, the Board instituted condemnation proceedings against Bresler-Lerner to condemn Parcel 15 for a high school site. Two petitions for this purpose were filed in the Circuit Court for Prince George's County on December 16 and December 30, 1964, hearing nos. 25055 and 25182, respec-

tively. The petitions in those two condemnation proceedings were attached as Exhibits 2 and 3. The condemnation proceedings had not been tried as of the date of the filing of the bill of complaint in the present case (June 27, 1966). They were set for trial in May, 1965, and were "passed" because Mr. Bresler was in the legislature and settlement was being considered. The petitions were reached again for trial in September, 1965, and "they were 'passed' for settlement."

Paragraph 13 alleges that in July, 1965, Bresler-Lerner made a proposal to the Board that "in lieu of a condemnation award by the Court they would agree upon a price with defendant (the Board) for Parcel 15 if Bresler-Lerner were assured by the City of Greenbelt that the City would raise no objection to Bresler-Lerner's application for denser zoning in Parcels 1 and 2 than the Master Plan adopted by the City authorized."

In Paragraph 14 it is alleged that at the specific request of Gwynn, the Assistant Superintendent of Schools, and "in his presence, meetings were held by members of the City Council of Greenbelt with Bresler-Lerner and/or their attorney to listen to their proposal" as set forth in the previous paragraphs and after "many meetings and discussions, the City Council of Greenbelt on October 18, 1965 went on record rejecting Bresler-Lerner's proposal by passing the following motion:

> "Request of Consolidated Syndicates, Inc. (Bresler-Lerner) for the City's support of its zoning requests for Parcels 1 and 2 in exchange for the sale of property to the Board of Education for a high school site be denied, and that the Board of Education be urged to pursue the acquisition of the high school site in Parcel 15."

Paragraph 15 alleges that Bresler-Lerner next made a proposal to the Board to transfer to it 55 acres in Parcels 1 and 2 for a 3-school complex to include the high school and offered to sell the Board "one-half of this acreage and to donate the other half to defendant (the Board), in a manner which could result in tax benefits to Bresler-Lerner."

In Paragraph 16 it is alleged that without notifying the City Council of Greenbelt, the Board took action at its meeting of

November 30, 1965, accepting the offer of Bresler-Lerner of the acreage in Parcels 1 and 2. William S. Schmidt, Superintendent of Schools of Prince George's County (Schmidt), informed the City Manager of Greenbelt that the Board "had to act on November 30, 1965, since Bresler-Lerner could not grant any extension of their proposal beyond that time." Schmidt's letter of December 3, 1965, was attached as Exhibit 4. As this letter is set out in full in the majority opinion, it need not be repeated here.

Paragraph 17 alleges that the City of Greenbelt and Greenbelt Homes, Inc., protested the new action taken by the Board and urged the Board to pursue the pending condemnation proceedings for the acquisition of Parcel 15 for a high school site. They both "in addition made good faith offers of parcels of land and money" which the Board could use toward the purchase of Parcel 15.

In Paragraph 18 it is alleged that Bresler-Lerner continued to propose to the Board that they would agree on a price for the sale of the acreage in Parcel 15 for a high school site, "if the City of Greenbelt, in addition to the offers of land and money made" to the Board by the City of Greenbelt and Greenbelt Homes, Inc. "would not object to Bresler-Lerner's requests for denser zoning of Parcels 1 and 2." Neither the City nor Greenbelt Homes would "accede to any such condition."

Paragraph 19 alleges that on March 24, 1966, the Board made final its decision to purchase from Bresler-Lerner 55 acres in Parcels 1 and 2 for a 3-school complex, and on March 31, 1966, pursuant to a stipulation filed by the attorneys for the Board and Bresler-Lerner, the condemnation proceedings for the acquisition of Parcel 15 were removed from the court's trial calendar of April 7, 1960, and were marked "Passed for Settlement."

Paragraphs 20 and 21 were as follows:

"20. Defendant's [the Board's] use of Parcels 1 and 2 as a high school site will require the widening of roads in residential areas not intended for such traffic and will result in the irreparable destruction and impairment of valuable property rights of plaintiffs.

"21. In reversing its decision to buy Parcel 15 for a high school site, in being influenced by considerations other than the public interest in the selection of Parcels 1 and 2, and by substituting for its own judgment the pressures and influence which Bresler-Lerner were able to assert by reason of their ownership and/or control of Parcels 15, 1 and 2, defendant has acted arbitrarily, capriciously and in breach of its trust as a public body."

The prayers for relief were for (1) a declaration that the contract entered into by the Board to purchase a high school site on Parcels 1 and 2 be declared illegal, void and of no effect; (2) the Board, its agents, servants, attorneys and employees be enjoined from contracting for such a purchase and from building a high school on Parcels 1 and 2 and (3) for other relief.

Although, as pointed out in the majority opinion, it has long been established in Maryland that the selection of the location of new schools is committed to the discretion of the county school board, such a selection may be successfully challenged if the Board acts arbitrarily, capriciously or in breach of trust. As Judge (now Chief Judge) Hammond stated, for the Court, in *Dixon v. Carroll County Board of Education,* 241 Md. 700, 705, 217 A. 2d 364 (1966) :

"The paragraphs and subparagraphs of the pleading considered separately or as a whole simply do not specify that the County school officials have exceeded the powers given them by statute to build a new school or that in exercising these powers *they have acted fraudulently* or corruptly or *in breach of their trust.* This being so, the demurrer to their pleading rightly was sustained." (Emphasis supplied).

Do the allegations of the bill of complaint, with their reasonable implications, indicate that the Board in the exercise of its discretion acted arbitrarily and capriciously and breached its trust? It seems clear to me that they do.

The Board in September, 1964, had two parcels, Parcel 15 and part of Parcels 1 and 2, before it for consideration of se-

lection. Both parcels were controlled or owned by Bresler-Lerner. At the time when the Board was beginning to consider the selection, Bresler-Lerner urged the Board to select part of Parcels 1 and 2 rather than Parcel 15. The Board then held meetings with the legislative body of the municipality in which the high school was to be located to determine where that municipality, Greenbelt, desired the high school to be located. Greenbelt is not just another municipality, but is a very special one conceived as a planned community by the President and The Congress of the United States as early as 1935, so that, it may be reasonably inferred, the Board believed that the recommendations of the governing body of this unusual, if not unique, planned community would be of great value to it in making the selection of the high school site. Not only did the governing body of Greenbelt recommend Parcel 15 as the high school site, but Parcel 15 was recommended as the high school site in the Master Plan adopted officially by Greenbelt in March, 1965. This location was also recommended by the Maryland-National Capital Park and Planning Commission in its Area 13 Plan. It can be reasonably inferred that these official planning bodies, with their qualified staffs, duly and properly made a study of the two competing locations and properly concluded that as a matter of proper planning and giving effect to the applicable criteria, Parcel 15 was to be preferred to part of Parcels 1 and 2.[1]

---

1. The City of Greenbelt by Chapter 532 of the Laws of 1937 was given power to enact zoning ordinances not in conflict with the existing law of the State of Maryland "for the purpose of using the orderly growth of the City and the protection of the public health, welfare, safety and morals," and also to "regulate the location, erection or repair of buildings in accordance with the public health, welfare and safety." By the same Act of Assembly, the City is given the power "to have and exercise any and all powers that are now given to municipalities, except the City of Baltimore, or that may be given to them by the general law of the State of Maryland * * *." One such power given municipalities by the general law of Maryland, Code (1957) Article 66B, sections 10-20, is to make, adopt, amend, extend, add to, or carry out a municipal plan as provided in the applicable subsections. By section 16 of Article 66B, the plan "shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted, and harmonious development of the municipality and its environs which will, in

The City Council of Greenbelt, as the legislative body of that municipality, by its official action on November 10, 1964, unanimously voted that the contemplated high school be located on Parcel 15, and so advised the Board. Here again, it may reasonably be inferred that the legislative body did its duty and recommended Parcel 15 for the location of the proposed high school because it believed the public interest required that this

accordance with present and future needs, best promote health, safety, morals, order, convenience, prosperity, and general welfare, as well as efficiency and economy in the process of development; including, among other things, adequate provisions for traffic, the promotion of safety from fire and other dangers, adequate provision for light and air, the promotion of the healthful and convenient distribution of population, the promotion of good civic design and arrangement, wise and efficient expenditure of public funds, and the adequate provision of public utilities and other public requirements." When the master plan has been adopted, section 18 of Article 66B provides that "no street, square, park or other public way, ground or open space, *or public building or structure*, or public utility, whether publicly or privately owned, *shall be constructed or authorized* in the municipality * * * until the location, character, and extent thereof shall have been submitted to and approved by the commission;" with a right of appeal from an adverse decision to the council which has the power to overrule the disapproval by a vote of two-thirds of its membership.

Although the courts may take judicial notice of the public general laws of Maryland, State v. Jarrett, 17 Md. 309 (1861) and may consider applicable statutes, although they are not specifically alleged in the bill of complaint, see *Story, Equity Pleading*, section 24, and *Miller, Equity Procedure* § 92, page 116, Note 4, it is not clear from the allegations in the bill of complaint in this case, that any of the plaintiffs have sufficient standing to obtain relief pursuant to these statutory provisions inasmuch as there is no allegation that the location of the properties of the two individual plaintiffs at 117 Northway and 21-E. Ridge Road in Greenbelt is in such close proximity to the 55 acre tract in Parcels 1 and 2 as to make them, *prima facie*, persons suffering special damage different in kind from the damage suffered by the public generally. See Bryniarski v. Montgomery County Board of Appeals, 247 Md. 137, 144, 230 A. 2d 289, 294 (1967). It would appear that the power to enforce statutes would be in the City of Greenbelt, and possibly in other public officials, and not in Greenbelt Homes, Inc., or in property owners in Greenbelt unless their special damage is alleged and proved.

location be selected by the Board rather than a part of Parcels 1 and 2. This unanimous recommendation by the City Council of Greenbelt *was accepted by the Board,* as shown by its resolution of the same day (November 10, 1964) as that of the City Council whereby the Board authorized its proper officials to negotiate with Bresler-Lerner to acquire Parcel 15. The allegations of the bill of complaint show that the location of the high school on Parcel 15 is in accordance with the applicable Master Plan and had the approval of the City Council of Greenbelt.

Being unable to reach an agreement with Bresler-Lerner on a fair valuation for Parcel 15, condemnation proceedings were instituted to acquire that parcel. Although the petitions for condemnation were filed in December, 1964, they were never brought to trial, having been "passed" in May, 1965, and again in September, 1965, because settlement was being considered. It may be reasonably inferred from these delays that Bresler-Lerner was seeking the postponement of these cases in order to exercise pressure upon the Board to revoke its prior decision to acquire Parcel 15 and to acquire 55 acres of Parcels 1 and 2 if Bresler-Lerner was unable to induce the City of Greenbelt to give them higher density in Parcels 1 and 2 than that permitted under the applicable Master Plan.

In July, 1965, Bresler-Lerner, while the condemnation cases were pending and having been postponed once, proposed to the Board that in lieu of a condemnation award by the court, they would agree upon a price for Parcel 15 if Bresler-Lerner were assured by the City of Greenbelt that the City would raise no objection to their application for denser zoning in Parcels 1 and 2 than the Master Plan adopted by the City authorized. It may reasonably be inferred that this proposal of Bresler-Lerner was an effort to induce the City of Greenbelt to engage in "contract zoning" which this Court held to be unlawful in *Baylis v. City of Baltimore,* 219 Md. 164, 148 A. 2d 429 (1959) as resulting in a disruption of the basic zoning plan, an impairment of the uniformity of zones and an attempt to bargain away the police powers of the municipality. Gwynn, on behalf of the Board, specifically requested "meetings between the

members of the City Council and Bresler-Lerner, and/or their attorney, to listen to the Bresler-Lerner proposal" and "many meetings and discussions" were held. The City Council of Greenbelt on October 18, 1965, went on record as rejecting the proposal and in its resolution (set out in full in paragraph 14 of the bill of complaint) *urged* the Board to pursue the acquisition of the high school site in Parcel 15.

It was not until after Bresler-Lerner's proposal for special zoning consideration in regard to the entire 230 acres in Parcels 1 and 2 had been finally rejected by the City Council of Greenbelt that Bresler-Lerner made a proposal to the Board to transfer 55 acres of Parcels 1 and 2 to the Board for a 3-school complex to include the high school. The reasonable inference from this allegation is that the proposal for a 3-school complex rather than for a high school site emanated from, and was instituted by, Bresler-Lerner. Bresler-Lerner offered to sell the Board one-half of the 55 acres and to donate the other half to the Board "in a manner which could result in tax benefits to Bresler-Lerner." *Without notifying the City Council of Greenbelt,* the Board took action at its meeting of November 30, 1965, accepting the offer of Bresler-Lerner. The Board "had to act" on that date because Bresler-Lerner could not grant any extension beyond that date. The letter of December 3, 1965, from Schmidt, Superintendent of Schools for Prince George's County to the City Manager of Greenbelt, attached as an exhibit to the bill of complaint and set out in full in the majority opinion, indicates that the Board made its "on-the-site inspection" of the various tracts on November 29, the day before the Board's meeting of November 30. It can reasonably be inferred from this that the Board had not made an on-the-site inspection of the 55 acres of Parcels 1 and 2 prior to that time. The Schmidt letter also discloses that Schmidt had indicated to the City Manager that "this item would not appear on the agenda of the Board meeting which was held on Tuesday, November 30, 1965." It is thus established that not only was the City Council of Greenbelt not notified of the action of the Board, but that the Superintendent of Schools had advised the City Manager that the matter was not scheduled for action by the Board at the November 30 meeting. The staff of the Superintendent had

determined to recommend a delay in the Board's action, so that it could obtain data from the staff's engineers in regard to the cost of the site development as a considerable amount of land removal was involved. It was necessary in the staff's opinion to obtain an extension of time from Bresler-Lerner in regard to their new proposal relative to the 55 acres of Parcels 1 and 2. The Board sought such an extension of time from Bresler-Lerner in accordance with the staff recommendation, but this extension could not be obtained because it could not be guaranteed that the trustees of the Gudelski estate would be willing to grant such an extension and Mr. Bresler was dubious as to the attitude of the Orphans' Court if he and the trustees would request approval and ratification of a sale of 55 acres at $8,000 per acre, in that two parcels of land from the same group of owners had sold on the basis of $17,500 an acre. There was no explanation in regard to how the Orphans' Court would approve and ratify a sale of 27½ acres for a consideration of $16,000 an acre and a *gift* of the remaining 27½ acres. Although it was not the Board's intention to take action on the matter at the November 30 meeting, its inability to obtain an extension of time "left only one action, i.e., the purchase of the property in parcels 1 and 2."

It is thus apparent that the Board which had theretofore sought and had received the consideration and recommendation of the legislative body of the City of Greenbelt in regard to the location of the high school, without even notifying the officials of the City, and indeed assuring the City Manager that the matter would not be on the agenda of the Board's November 30 meeting, and after an on-the-site inspection of the 55 acre tract on the day before the meeting, proceeded to yield to the economic pressure brought by Bresler-Lerner upon it by the failure to grant an extension in order that the Board could consider the matter of expense in connection with the site recommended by the Superintendent's staff, and accepted the Bresler-Lerner offer for the 55 acre tract in Parcels 1 and 2, "subject to the State Superintendent of Schools and the securing of favorable test borings." There is nothing in the bill of complaint to indicate that the approval of the State Superintendent was obtained or that favorable test borings were secured.

After it learned of the new action, both the City of Greenbelt and Greenbelt Homes, Inc. protested the new action taken by the Board and urged the Board to pursue the pending condemnation actions to acquire Parcel 15. They also, in addition, made good faith offers of land and money which the Board could use toward the purchase of Parcel 15.

Even after the Board's action on November 30, Bresler-Lerner continued to propose to the Board that they would agree on a price for the land in Parcel 15 if the City of Greenbelt and Greenbelt Homes, Inc. would not object to Bresler-Lerner's request for denser zoning of Parcels 1 and 2, but neither would agree to this condition. The Board on March 24, 1966, made its final decision to purchase the 55 acre tract from Bresler-Lerner and on March 31, 1966, pursuant to a stipulation between counsel for the Board and Bresler-Lerner filed in the pending condemnation cases, they were removed from the court's calendar of April 7, 1966, and marked "Passed for Settlement." It may reasonably be inferred from these allegations that Bresler-Lerner's primary objective was to obtain special zoning consideration for the 230 acres in Parcels 1 and 2 and the pressure exerted on the Board on November 30 was done deliberately to obtain a stronger bargaining position for Bresler-Lerner in their pursuit of that objective. It was only when even that added factor failed that Bresler-Lerner finally agreed that the sale of the 55 acre tract out of Parcels 1 and 2 should be consummated by the Board and that the Board aided, abetted and cooperated with Bresler-Lerner to obtain this objective.

It was also alleged that the use of Parcels 1 and 2 as a high school site would require the widening of roads in a residential area "not intended for such traffic" and would "result in irreparable destruction and impairment of valuable property rights of the plaintiffs."

It may reasonably be inferred that there would be a substantial increase in traffic by going forward with the proposal in regard to the 55 acre tract which would be injurious to the already established residential development. This is one of the criteria to be considered by planning and zoning authorities in the location of buildings and may indeed result in irreparable

injury to existing residential values. See *Tauber v. Montgomery County,* 244 Md. 332, 223 A. 2d 615 (1966).

It is in this setting that the allegations of paragraph 21 are to be considered. This entire paragraph has been set out in full and it alleges that the Board "acted arbitrarily, capriciously and in breach of its trust as a public body" in (1) being influenced by considerations other than the public interest in reversing its decision to buy Parcel 15 for a high school site, (2) in being influenced by considerations other than the public interest in the selection of Parcels 1 and 2 and (3) by substituting for its own judgment the pressures and influence which Bresler-Lerner were able to assert by reason of their ownership or control of Parcels 15, 1 and 2. These conclusionary allegations obviously were intended to summarize the ultimate effect of the detailed allegations theretofore set forth in the bill of complaint. They do not stand alone, separated and disassociated from the allegations in the preceding 20 paragraphs. In my opinion, there are sufficient allegations of fact, with their reasonable inferences, as above set forth, to indicate, *prima facie,* that the Board had abdicated its judgment in order to promote the Bresler-Lerner primary objective and that the selection of the 55 acre tract, was not, *prima facie,* made upon considerations arising from the public interest.

In the majority opinion, consideration is given to a resolution of the Board of February 24, 1966, a letter from the State Superintendent of Schools of March 22, 1966, in which he gives *both sites* his approval and indicates that the decision is a local one, portions of a resolution of the Board of March 24, 1966, and the settlement for the portion of Parcels 1 and 2 on June 22, 1966. None of these matters appears in the bill of complaint or in the attached exhibits. They appear in the affidavit of Schmidt in support of the Board's motion for summary judgment. This motion was *overruled* by the trial court. It is well established that in considering a demurrer to a bill of complaint, only the allegation of the bill of complaint, exhibits attached and reasonable inferences from the facts alleged may be considered. Other matters should not be considered in reaching a decision in regard to the demurrer. *Standard Founders v.*

*Oliver,* 168 Md. 317, 345-346, 178 A. 2d 223, 235 (1935). *Miller, Equity Procedure,* § 132, page 171.

Inasmuch as the trial court filed no opinion in this case giving its reasons for the sustaining of the demurrer, it is not clear that the trial court considered these matters which do not appear in the allegations of the bill of complaint or in the attached exhibits. In any event, they should not have been considered by the trial court in reaching its decision on the demurrer and should not be considered by us. *Standard Founders v. Oliver, supra.*

In my opinion it would be arbitrary and capricious conduct on the part of the Board to reverse its decision to buy Parcel 15 for a high school site when that site was in conformity with the Master Plan for Greenbelt and to proceed to purchase a site which has not been alleged to be in conformity with that Master Plan and which it may reasonably be inferred from the consistent and strenuous opposition by the City of Greenbelt is not in the Master Plan as a school site and has not been approved by any planning or zoning commission, or if disapproved, such disapproval had been reversed by a vote of two-thirds of the City Council of Greenbelt. Article 66B, section 18 specifically provides that when a master plan has been adopted *"no * * * public building* or structure * * * *shall be constructed or authorized* in the municipality * * * until the location, character, and extent thereof shall be submitted to and approved by the commission; * * *."* (Emphasis supplied). There are no exceptions for the local school boards, or, indeed, for any other public agency. As this provision of law was passed in 1933, (Laws of 1933, Chapter 599) and all inconsistent laws, by section 28 of Chapter 599 of the Laws of 1933, except Chapter 705 of the Laws of 1927, were repealed, it seems clear to me that the power of the Board under Article 77, section 56, which was first enacted in 1916 by the Laws of 1916, Chapter 506, section 25C, is subject to the later legislation. If there is any inconsistency between the two statutory provisions, the 1933 enactment, with its express repealer of inconsistent laws, would prevail over the 1916 enactment.

It would also be arbitrary and capricious, in my opinion, for the Board to reverse its decision to buy Parcel 15 for a high

school site which the bill of complaint alleges had the approval of the State Superintendent—a condition precedent by Article 77 section 56 — and proceed to acquire a different site which the bill of complaint does not allege has such approval. Here again, the reasonable inference would be that, since the two sites are alleged to be different, the 55 acre site alleged to be injurious to the surrounding property owners, contrary to the Master Plan and contrary to the resolutions of the City Council of Greenbelt, the State Superintendent would not approve the 55 acre tract.[2]

Then too, it would be arbitrary and capricious for the Board to disregard the factors alleged in Paragraph 8 of the bill of complaint which caused inclusion of Parcel 15 in the Master Plan as a high school site, i.e., the "location, availability of established roads, its separation from the residential district proper with consequent less adverse effect on traffic congestion and pedestrian safety and its proximity to existing park and other recreational facilities" and to approve a site which would "require the widening of roads in residential areas not intended for such traffic" and which would "result in unfavorable destruction and impairment of valuable property rights" of the affected property owners, as alleged in Paragraph 20.

In my opinion, the decision of the majority is not only in error for the reasons already stated, but is against the trend of modern authority which seeks to keep the allegations in pleadings short, succinct and not prolix, so that the opposite party will be informed of the complaint against him, may answer, and then proceed to trial on the merits.

Professor Charles Alan Wright, in his "Federal Courts," § 68, page 247 describes the theory of modern pleading as follows:

---

2. Even assuming, arguendo, that the State Superintendent's letter of March 22, 1966, could be considered in the ruling on demurrer, it is quite doubtful that the letter is a sufficient approval of the 55 acre tract under the alleged circumstances. The letter rather passes the matter back to the local Board to make the decision, and would appear to seek to authorize the Board to proceed with the selection of an injurious site, contrary to the applicable Master Plan.

"The only function left to be performed by the pleadings alone is that of notice. For these reasons, pleadings under the rule may properly be a generalized summary of the party's position, sufficient to advise the party for which incident he is being sued, sufficient to show what was decided for purposes of res judicata, and sufficient to indicate whether the case should be tried to the court or to a jury. No more is demanded of pleadings than this; history shows that no more can be successfully performed by pleadings."

In commenting on the requirement that the pleader allege the "dry, naked, actual facts," avoiding the pitfalls of stating conclusions on the one hand and pleading evidence on the other, Professor Wright states:

"This requirement was based on a failure to perceive that the distinction between facts and conclusions is one of degree only, not of kind. But it had a further weakness. The pleader who set forth exactly the right amount in his pleading found himself committed unreservedly to a course of action and a factual statement from which he could not deviate at the trial. Many pleaders discovered that an obvious solution was to plead too much, to include every possible allegation regardless of the unlikelihood that the evidence would support it. The result of such overpleading was 'frightful expense, endless delay and an enormous loss of motion.' " (Id. at 248).

The ultimate purpose of the Federal Rules, on which the Maryland Rules are to a large extent based, is well stated by Circuit Judge Sibley of the United States Circuit Court of Appeals for the Fifth Circuit, in *DeLoach v. Crowley's, Inc.*, 128 F. 2d 378, 380 (1942) as follows:

"Cases are generally to be tried on the proof rather than the pleadings."

Then too, it is important from a public point of view, that complaints against public bodies or officials based on alleged arbi-

trary, capricious conduct and an alleged breach of trust, should not, if at all possible, be disposed of on the pleadings, but should be tried in court where the complaints can be heard and the explanation of the public officials involved, be considered. This is particularly true where the complaints are made by responsible people and appear to be supported by responsible public bodies, as in the case at bar. It is far wiser, in my opinion, to have cases like the present one tried in open court on their merits, than to have them disposed of on the pleadings.

I do not suggest that the Board may not have a full and complete explanation of its actions in this matter, but I think the allegations in the bill of complaint require it to make the explanation. The public interest as I see it, also requires an explanation.

### (2)

In my opinion, it was an abuse of discretion on the part of the trial court to permit a withdrawal of the Board's answer by an *ex parte* order and to permit the Board to file a second demurrer, implemented for the required specificity of reason by a trial memorandum of the Board, and then to sustain the second demurrer after having overruled the first demurrer.

The orderly procedure for the pleadings in equity suits is set forth in Maryland Rules 370 to 379. The form of the bill of complaint or petition and its basic contents are set forth in Rule 370. The common law prolixity of allegations and unnecessary prayers for process and the prayer that the defendant answer are eliminated, and a "concise statement of the facts upon which the plaintiff seeks relief" is provided for as one of the contents of the bill of complaint. Rule 371, in regard to defenses, provides for either (1) an answer or (2) a demurrer, with a provision for the combination in one pleading of the demurrer and the answer. There is no provision in the Rule for more than one demurrer. Rule 372 provides for the contents and effect of allegations in an answer and that defenses on demurrer *may* be available by answer. Rule 373 has specific provisions in regard to a demurrer. The provisions of Rule 345 relating to demurrers in actions at law are made applicable to demurrers in equity as to scope and contents. One of these requirements is that the demurrer "state in detail the question of law or insuffi-

ciency of substance upon which the demurrer is founded." A demurrer shall not be allowed "for a mere informal statement of a cause of action or defense, provided such statement is sufficient in substance." Section c of Rule 373 provides that "[i]f a demurrer is overruled, and the person demurring shall not have answered previously, he shall have the right to answer without withdrawing such demurrer and upon appeal he shall be entitled to have the questions of law arising under the demurrer fully decided."

These rules forward the policy of the law to get the suit at issue and to trial on the merits.

In the present case, the Board *did* file a demurrer, its demurrer was *overruled,* it then *did* file its answer as provided in Rule 373 c. *The suit was then at issue* and nothing remained to be done so far as the basic pleadings were concerned. The Board, however, then filed a motion for summary judgment, supported by affidavit, on the ground that there was no genuine dispute as to a material fact and that it was entitled to judgment as a matter of law, as required by Rule 610. The trial court *overruled* this motion so that the case, already at issue, should have been tried on its merits in due course. There is no provision in the Maryland Rules for the withdrawal of an answer—which as indicated may include defenses which could be raised by demurrer—and for the filing of a second demurrer. Such action seems to me to frustrate the primary purpose of the Rules, i.e., to get a case to trial on the merits. The Board had already filed one demurrer. It could have raised in its answer any defenses it might have overlooked in the demurrer. It should hardly have a *third* opportunity to raise additional defenses, apparently twice overlooked or, at least, not raised. But even its second demurrer did not comply with the provisions of the Rule in regard to specifying sufficiently the grounds of the demurrer. I know of no rule which allows a trial court to permit a trial memorandum to be added to a demurrer already filed in court to supply the necessary specificity of grounds. In my opinion, this is an unfortunate practice and we should not give it our approval. Even less should we give our blessing to the withdrawal of an answer and the filing of a second demurrer.

The majority suggests that there was no prejudice to the plaintiffs as their bill of complaint did not allege a cause of action in equity in any event. It is, of course, obvious that if a cause of action was alleged, the plaintiffs have been gravely injured. Assuming, *arguendo,* that there was some insufficiency of allegation, it frequently happens that the necessary proof is adduced at the trial to establish a *prima facie* case and the plaintiff is permitted, under Maryland Rule 320 c and d 1 (b), to conform his pleadings with the proof. See *Brucker v. Benson,* 209 Md. 247, 254-56, 121 A. 2d 230, 234-35 (1956). The plaintiffs in this case have been denied this possibly and, to that extent, at least, were prejudiced by the trial court's actions on the pleadings.

I would reverse.