CECIL COUNTY BOARD OF EDUCATION
*v.* PURSLEY ET AL.

[No. 291, September Term, 1968.]

*Decided March 12, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, FINAN, SINGLEY and SMITH, JJ.

*Doris P. Scott,* with whom was *Alan M. Wilner* on the brief, for appellant.

No brief filed on behalf of appellees.

BARNES, J., delivered the opinion of the Court.

The appellant, Cecil County Board of Education (the Board)

has appealed in accordance with Code (1957) Art. 5, Sec. 7, from an Interlocutory Injunction issued by the Circuit Court for Cecil County (Rollins, J.) on October 3, 1968, temporarily enjoining the Board on and after October 14, 1968 from transporting by buses children residing on Maryland Route 277 between Brewster's Road and the B & O Railroad, from that area to the Kenmore School, and directing the Board to permit such children to attend the Cecil Manor Elementary School.

The Board, prior to the beginning of the school year in September, 1968 and in connection with the contemplated opening of the new Leeds Elementary School and the new Cherry Hill Middle School, found it necessary to revise the school district lines for the five Elkton area elementary schools, i.e., Leeds, Kenmore, Gilpin Manor, Cecil Manor and Holly Hall.

As a part of the redistricting plan, approximately 41 elementary school children who formerly attended Cecil Manor were transferred to Kenmore. Some of these children lived within a radius of one mile of Cecil Manor, although in actual walking distance a number of them were more than a mile distant. A number of parents in the Elk Mills area protested the redistricting, and after the Board reaffirmed the redistricting plan, filed a bill of complaint, on August 27, 1968, against the Board praying (1) for a temporary injunction restraining the Board from causing the elementary students in Elk Mills from being transported at public expense and to order the Board to permit the students to attend Cecil Manor, (2) for fixing a time for a hearing on the temporary injunction, (3) for an order, after final hearing, rescinding the Board's bussing of the students until it can justify the necessity of expending school funds for transporting them when they are within walking distance of a school and, (4) for other relief.

The bill of complaint, filed by six residents and taxpayers of Cecil County, alleged their ownership of property in, and payment of taxes to, the County, the prior action of the Board, and that this action results in "the expenditure of school funds to transport these children, who are within walking distance of a school, is an improper use and a waste of said funds." After alleging their protest to the Board, it was alleged that the students "who previously were within walking distance of the Elk

Mills elementary school, and who did in fact walk to said school," would be caused "to be now transported by bus to another school" and that "this action by said Board necessitates the improper and unlawful waste of the tax monies for transportation of students when it is not required." It was further alleged that this action by the Board will cause the public school funds to "be improperly dissipated, all to the Plaintiffs' and all taxpayers of Cecil County irreparable injury" for which the plaintiffs had no plain, speedy and adequate remedy at law.

The Board filed a demurrer to the bill of complaint on September 24, 1968 alleging that it failed to state a cause of action on several grounds:

1. There were no allegations that the Board acted in bad faith or abused its discretion in establishing the school district lines.

2. There were no facts alleged showing that the public funds would be improperly dissipated or wasted.

3. Absent a claim of deprivation of equal educational opportunity or unconstitutional discrimination because of race or religion, no student has a right or privilege to attend a particular school.

4. No facts were alleged which showed that the redistricting plan allegedly involving transporting by bus of certain children in the Elk Mills area who formerly walked, was not a reasoned, dispassionate, independent exercise of judgment in the interest of all of the citizens of Cecil County.

5. The allegation that children who formerly walked were now transported would not of itself, without more, constitute an "improper use and waste of said funds."

The demurrer also set forth that the allegations of the bill involved only an educational matter of which the Board had exclusive jurisdiction, the plaintiffs had failed to exhaust their administrative remedies and the plaintiffs had no standing as taxpayers to maintain the suit in that they failed to demonstrate how they personally will suffer loss and whether such loss is common to all the residents and taxpayers of Cecil County.

The demurrer came on for hearing before the Chancellor on October 1, 1968 and was fully argued. Counsel for the plaintiffs asked leave to amend the bill of complaint by adding by inter-

lineation at the end of paragraph I, in which the parties plaintiff were identified as "taxpayers of said County," the words "and for parents of children proposed to be bused to a distant school as more fully set forth herein," and at the end of paragraph V after the words "a waste of public funds", the words "and said decision is arbitrary, illegal, unlawful, capricious and a breach of the public trust imposed upon said Board of Education." The bill of complaint in the record does not indicate that the words mentioned were physically added to paragraphs I and V respectively. Counsel for the Board, however, indicated that the Board renewed its demurrer to the bill of complaint as amended.[1]

Following the luncheon recess after the arguments on the demurrer were concluded, the Chancellor, over the objection of counsel for the Board, proceeded to take testimony on the question of whether or not the temporary injunction should be issued. The plaintiffs called one of the defendants, Marple Lynch, president of the Board and Mrs. Joyce Marie Bolte, a resident of the Elk Mills area, as their witnesses. The Board called Robert A. Gibson, Superintendent of Schools for Cecil County as its witness.

Without recounting the testimony produced at the hearing in detail, it was established that there were approximately 41 students who lived within a mile of Cecil Manor, who had walked to school prior to the school redistricting, but who were now being transported to Kenmore. The testimony of the Superintendent established that the Board in considering the new dis-

---

1. It is doubtful that in the absence of the incorporation of the proposed amendments in the bill of complaint, the issue of whether or not the decision of the Board was arbitrary, illegal, unlawful, capricious and a breach of the public trust imposed upon the Board was properly before the trial court. See Lohrfink v. Still, 10 Md. 530 (1857) in which our predecessors held "that permission to amend does not, *per se*, amount to an amendment" and that the "amendment must actually be made, either by altering the declaration in the cause, or by filing a new one." (10 Md. at 535) Inasmuch as counsel for the Board refiled the Board's demurrer as if the amendments had been physically made and the trial court considered the issue as before it, we prefer to decide the issue on the merits.

trict lines, made necessary by the completion of two new schools, gave consideration to future growth patterns, the capacity of school buildings and a proper enrollment so that good programming could be provided. The Board considered the logical and economical transportation routes, the safety of the children (so that they would not have to cross Maryland Route 40 or the railroad tracks at grade) as well as the geographic nearness to the schools to which the students were assigned. The Chancellor in his oral opinion stated: "I think the School Board has done a remarkable job in projection and coming as close as they do."

The Superintendent testified, without contradiction, that:

"In this case, we had very crowded conditions at Cecil Manor and we had very crowded conditions in Kenmore, and we needed an additional school. The school was built and it meant in order to relieve the crowded condition at Kenmore we had to change the boundaries so that some of the children attending that school would then be going to Leeds, and some of the children, for example, going to Cecil Manor would then go to Kenmore. As it turns out now, we have very adequate space in all of the schools. And this is something that happens not only in Cecil County but every county in the State of Maryland. As schools are built, boundary lines have to be changed. And of course, there are always segments of the population that are unhappy and it is quite understandable why they are. They have been attending a certain school and now they have to go to a different school. This happens not only in Cecil County, but everywhere."

He testified that it is important to anticipate the school enrollment as accurately as possible—

"Because, every year we have to hire additional teachers for certain schools in the County, because the enrollment has come in above what we had anticipated. We have to get more books and equipment and so forth. We also have some schools where the enrollment is too low. So, my point is to the best of our ability,

we estimate the enrollment. If the enrollment had been what we expected it to be or greater than what we had anticipated, it would have been utterly impossible to have placed these students in this school. As it turned out at this stage of the game, it is possible to place these students there."

He further testified that the educational facilities at Cecil Manor and Kenmore are equal. There is no evidence that there were any racial or religious considerations involved in the establishment of the new school district lines, and no such considerations were alleged to have been involved.

It is interesting to observe that the Superintendent testified in regard to the exact figures for the cost of transportation for students at Cecil Manor and at Kenmore for the months of September 1967 and 1968, respectively. For Cecil Manor in September 1967 the cost was $1,185.92 whereas in September 1968 it was $828.07, a *decrease* of $357.85. For Kenmore the cost in September 1967 was $814.34 whereas the cost for September 1968 was $799.28 a *decrease* of $15.06. The president of the Board testified that it had not been necessary to purchase another bus as a result of transporting the children to Kenmore.

There was no testimony whatever that the Board had acted fraudulently, corruptly or had abused its discretion so as to amount to a breach of trust. Indeed, the Chancellor, in his oral opinion, specifically found to the contrary. In commenting on whether or not the Board's action was fraudulent, corrupt or an abuse of discretion amounting to a breach of trust, the Chancellor stated :

"It isn't necessary that the Court go that far. And under no stretch of the imagination, could the Court say that the Board or the Superintendent were engaged in any such conduct. And I don't want from any decision in this case, any such inferences or conclusions to follow. That isn't so. These people are trying to do a job as best they know how. They're public servants and serving without compensation. And no matter what one does when he is trying to do his duty,

he is going to be criticized by some. It is a thankless job. I have served on many Boards for nothing, and I know what it is."

In regard to the drawing of the school district lines by the Board, the Chancellor stated:

"Now, in this particular instance, as the result of an arbitrary line drawn—and I find no criticism for that because even in zoning, you have to take one side of a street or a road in order to create different zones and the same thing applies in school districts, so there is no criticism along that line—but, here you have 41 children within walking distance of this school. However, barred from attending that school by this fixed arbitrary line. Now, the parents objected to it. It is an understandable objection and had they come in in an orderly action, the chances are they wouldn't have gotten to first base. But, in this instance they say that it is a needless expenditure of the taxpayers money.

"Now, the Court doesn't have any information on this preliminary matter, to determine what is the cost per mile, per student. Because it apparently is such a variable figure. But, here are 41 children, who, if placed back in the school where they had been, would not create overcrowding or overpopulation. I can't see in the evidence, where the Board or the Superintendent is going to have to transfer students, transfer teachers from one school to another. It is a question of taking the group in each grade and assigning them to a class. Which, in the final analysis will not be overcrowded. And that without even disturbing the 70 children being transported to the school from Glen Farms."

The Chancellor overruled the Board's demurrer to the bill of complaint, and as we have indicated, thereafter on October 3, 1968, passed an order for the interlocutory injunction already mentioned. On October 7, the Board moved for a stay of the interlocutory injunction, but this motion was denied by the

Circuit Court on the same day. The Board then filed its answer to the bill of complaint and on October 11 moved for the approval of a supersedeas bond which was denied by the lower court. The Board then filed a timely appeal to this Court.

We are of the opinion that under the applicable law, the evidence before the lower court was not sufficient to warrant the issuance of the interlocutory injunction in the case so that the Order of October 3, 1968 must be reversed. We do not find it necessary to consider or decide the other reasons urged by the Board in regard to why the interlocutory injunction should not have been issued.

Code (1957) Art. 77, Sec. 56 (1965 Repl. Vol.) provides, in part, as follows:

> "The county board of education shall divide the county into appropriate school districts, shall keep full records of the boundaries thereof, and shall locate and maintain schools, as needed, within each district."

The statutory provision commits to the discretion of the Board the districting and redistricting of Cecil County for school purposes. By a long line of decisions beginning with *Wiley v. Board of County School Commissioners of Allegany Co.,* 51 Md. 401 (1879), this Court has consistently held that a court of equity may not interfere in action taken by a county school board where the board has been given the power to take the action, unless that action is illegal or involves a situation in which the board has acted fraudulently, corruptly or so arbitrarily or unreasonably that the board has breached its trust.

In *Wiley*—a suit in equity by taxpayers (and as trustees of a school district in Cumberland) to enjoin a school board from converting a school house used for primary school purposes to a use for high school purposes—the lower court dismissed the bill of complaint. Its order was affirmed by this Court. Judge Alvey, for the Court, stated:

> "And the Board of County School Commissioners having the power to establish a county high school, irrespective of the donation of the school-house, the question, whether the discretion of the board has been, or

will be judiciously exercised or not in respect to such school, is a subject with which a court of equity has nothing to do. If the proposed act in establishing the high school be within the scope of the authority delegated, as it clearly is, it is not competent to a court of equity to restrain the exercise of the discretion of the commissioners given by the statute, unless it be clearly shown that the power has been, or is about to be corruptly and fraudulently used. * * * But so long as such body of public functionaries confine themselves within the limits of the power delegated, the court will not interfere with the exercise of their discretionary powers, or undertake to determine the question whether the act complained of be wise or unwise, good or bad. Where the Legislature has confided the power of determining as to the wisdom and expediency of an act authorized to be done, to a board of public functionaries, with them the decision of the question must rest. And that is the case here. The Board of County School Commissioners being clothed with power, in their discretion, to establish a county high school, their determination upon the subject cannot be reversed or controlled by a court of equity." (51 Md. at 404-05.)

*Wiley* has been cited with approval and followed by this Court in *Dixon v. Carroll County Board of Education,* 241 Md. 700, 217 A. 2d 364 (1966) ; *Gaither v. Board of Education of Howard County,* 247 Md. 629, 233 A. 2d 468 (1967) and in *Greenbelt Homes, Inc. v. Board of Education of Prince George's County,* 248 Md. 350, 237 A. 2d 18 (1968).

In *Bernstein v. Board of Education,* 245 Md. 464, 226 A. 2d 243 (1967), we applied the holding in *Wiley, Dixon* and *Gaither* to the board's power to revise school district boundaries. In *Bernstein,* which we regard as controlling in the present case, a suit in equity was instituted to enjoin the board from transferring certain children between elementary schools pursuant to a revision of school district boundaries by the board. Under the redistricting plan, children who had previously gone to one elementary school about two miles away were bussed to an-

other elementary school approximately four miles away. No additional busses, however, were required to effectuate the board's redistricting plan. The lower court, after a hearing on the merits, dismissed the bill of complaint and we affirmed. Judge Oppenheimer, for the Court, stated:

> "The remaining contentions of the appellants go to the validity of the Board's action. That action, as has been stated, was legislative in nature. This Court has consistently recognized that, in general, courts will not attempt to substitute their judgment for the expertise of school boards, acting within the limits of the discretion entrusted to them. As Judge Alvey, for the Court, said in *Wiley v. School Comm'rs,* 51 Md. 401, 406 (1879):
>
>> 'If every dispute or contention among those entrusted with the administration of the system, or between the functionaries and the patrons or pupils of the schools, offered an occasion for a resort to the courts for settlement, the working of the system would not only be greatly embarrassed and obstructed, but such contentions before the courts would necessarily be attended with great costs and delay, and likely generate such intestine heats and divisions as would, in a great degree, counteract the beneficent purposes of the law.'
>
> See also *School Comm'rs of Caroline County v. Breeding,* 126 Md. 83, 90, 94 Atl. 328 (1915) and *Dixon v. Carroll County, supra.* Courts in other jurisdictions have refused to interfere with the reasonable exercise of a school board's discretion in the assignment of children to particular schools. *Brown v. Bailey,* 238 Ky. 287, 37 S.W.2d 58 (1931); *State ex rel. Lewis v. Board of Educ.,* 26 Ill. App. 476 (1888). The appellants have the burden of showing that the Board's action was illegal or an abuse of discretion, and this burden they have not met." (245 Md. at 476, 226 A. 2d at 250-51.)

As we have already indicated, the Chancellor affirmatively

found in the present case that the action by the Board was not fraudulent, corrupt or such an abuse of discretion as would amount to a breach of trust. The Chancellor, however, apparently was of the opinion that because it must necessarily cost more to transport children by bus to a school other than the one to which they theretofore walked, there was a waste of taxpayer's money and hence the Board's action in requiring this as a part of the redistricting plan was arbitrary. This approach is too simplistic. As the testimony disclosed there were many important factors which the Board properly considered in making its determination of the new district lines. These have already been mentioned and need not be repeated here. A consideration of all of those factors could well lead the members of the Board as reasonable persons to conclude that it was for the best interests of the educational system in the county, the students and the taxpayers to incur the obviously small—and undetermined amount—of additional money required to transport the relatively few children by bus who had previously walked to another school. Although an increase in cost of transporting children to school would not, in itself, be sufficient to indicate arbitrary conduct on the part of the Board or a waste of public money in this case—curiously enough—the proof showed that the actual cost of transporting students in September 1968 after the redistricting plan had gone into effect at Cecil Manor and Kenmore was *less* than the corresponding cost of such transportation in September 1967, when the previously established district lines were in effect. This hardly indicates a waste of the taxpayer's money.

In our opinion, there was no evidence before the Chancellor which indicated that the Board had acted fraudulently, corruptly, arbitrarily, unreasonably or capriciously in breach of its trust and, hence, the interlocutory injunction was erroneously issued.

*Order reversed, the costs to be paid*
*by the appellees.*